WASHINGTON, Justice,
 

 delivered the opinion of the court, and, after stating the case, proceeded as follows : — It has been contended by the counsel for the defendants, 1st. That the capacity of the plaintiffs, as a corporation, to hold lands in Vermont, ceased by, and as a consequence of, the revolution : 2d. That the society being, in its politic capacity, a foreign corporation, it is incapable of holding land in Vermont, on the ground of alienage ; and that its rights are not protected by the treaty of peace : 3d. That if they were so protected, still, the effect of the last war between the United States and Great Britain, was to put an end to that treaty, and, consequently, to rights derived under it, unless they had been revived by the treaty of peace, which was not done.
 

 1. Before entering upon an examination of the first objection, it may be proper to premise, that this society is to be considered as a private eleemosynary *corporation, although it was created by a charter from the crown, for the administration of a public charity. The endowment of the corporation was to be derived solely from the benefactions of those who might think proper to bestow them, and to this end, the society was made capable to purchase and receive real estates, in fee, to a certain annual value, and also estates for life, and for years, and all manner of goods and chattels, to any amount.
 

 When the defendants’ counsel contends, that the incapacity of this corporation to hold lands in Vermont, is a consequence of the revolution, he is not undei-stood to mean, that the destruction of civil rights, existing at the close of the revolution, was, generally speaking, a consequence of the dismemberment of the empire. If that could ever have been made a serious question, it has long since been settled in this and other courts of the United States. In the case of
 
 Dawson's Lessee
 
 v.
 
 Godfrey
 
 (4 Cranch 323), it was laid down by the judge who delivered the opinion of the court, that the effect of the revolution was not to deprive an individual of his civil rights ; and in the case of
 
 Terrett
 
 v.
 
 Taylor
 
 (9 Cranch 43), and of
 
 Dartmouth College
 
 v.
 
 Woodward
 
 (4 Wheat. 518), the court applied the same principles to private corporations existing within the United States at the period of the revolution. It is very obvious, from the course of reasoning adopted in the last two cases, that the court was not impressed by any circumstance peculiar to such corporations, which distinguished them, in *this respect, from natural
 
 persons;
 
 on the contrary, they were placed upon precisely the same ground. In
 
 Terrett
 
 v. Taylor, it was stated, that the dissolution of the regal government, no more destroyed the rights of the church to possess and enjoy the property which belonged to it, than it did the right of any other corporation or individual, to his or its own property. In the latter case, the chief justice, in reference to the corpora,
 
 *214
 
 tion of the college, observes, that it is too clear to require the support of argument, that all contracts and rights respecting property remained unchanged by the revolution; and the same sentiment was enforced, more at length, by the other judge who noticed this point in the cause.
 

 The counsel, then, intended, no doubt, to confine this objection to a corporation consisting of British subjects, and existing in its corporate capacity, in England, which is the very case under consideration. But if it be true, that there is no difference between a corporation and a natural person, in respect to their capacity to hold real property
 
 ;
 
 if the civil rights of both are the same, and are equally unaffected by the dismemberment of the empire, it is difficult to perceive, upon what ground, the civil rights of a British corporation should be lost, as a consequence of the revolution, when it is admitted, that those of an individual would remain unaffected by the same circumstance.
 

 But it is contended by the counsel, that the principle so firmly established, in relation to corporations ^existing in the United States, at the period of the revolution, is inapplicable to this corporation, inasmuch as the courts of Vermont can exercise no jurisdiction over it, to take away its franchises, in case of a forfeiture of them, by
 
 misuser
 
 or
 
 non-user,
 
 or in any manner to change the trustees, however necessary such interference might be, for the due administration and management of the charity. If this be a sound reason for the alleged distinction, it would equally apply to other ■ trusts, where the trustees happened to be British subjects, residing in England, and entitled to lands in Vermont, not as a corporate body, but as natural persons, claiming under a common grant.. The question of amenability to the tribunals of Vermont, would be the same in both cases, as would be the consequent incapacity of both to hold the property to which they had an unquestionable legal title, at the period of the revolution.
 

 It is very true, as the counsel has insisted, that the courts of Vermont might not have jurisdiction in the specified cases; and it is quite clear, that were they to exercise it, and decree a forfeiture of the franchises of the corporation, or the removal of the trustees, the plaintiffs would not be less a corporation, clothed with all its corporate rights and franchises. But it is not perceived by the eourt, how this exemption of the corporation from the jurisdiction of a foreign court to forfeit its franchises, or to interfere in its management of the charity, can destroy, or in any manner affect its civil rights, or its capacity to hold and enjoy the property legally *vested in it. It would surely be an extraordinary principle of law, which should visit such a corporation with the same consequences, on account of a want of jurisdiction in the courts of the country where the property lies, to inquire into its conduct, as would happen, if, after such an inquiry, judicially made, the corporation should be found to have forfeited its franchises ; in other words, that the possibility that the corporation might commit a forfeiture, which the law will not presume, or might require the interference of a court of chancery to enforce the due administration of the charter, which might never happen, should produce a forfeiture, or something equivalent to it, of the very funds which were, in whole, or in part, to feed and sustain the charity. This, nevertheless, seems to be the amount of the argument, and it is deemed by the court too unreasonable to be maintained, unless it appeared to be warranted by judicial decisions. It would seem,
 
 *215
 
 that the state in which the property lies ought to be satisfied, that the courts of the country in which the corporation exists, will not permit it to abuse the trusts confided to it, or to want their assistance, when it may be required to enable it to perform them in a proper way.
 

 Were it even to be admitted, that the legislature of Vermont was competent to pronounce a sentence of forfeiture of the property belonging to this corporation, upon the ground of its having abused, or not used its franchises, still, the act of 1794 does not profess to have proceeded upon that ground. The only reasons assigned in the ^preamble of the act, for depriving the plaintiffs of this property, are: 1. That, by the custom and usages of nations, aliens cannot, and ought not to hold real estate in a country to whose jurisdiction they cannot be made amenable : and 2. That this corporation, being created by, and existing within, a foreign jurisdiction, all lands in the state, granted to the said society, became vested, by the revolution, in that state. For aught that appears to the contrary, the society was, at the moment when the act passed, fulfilling the trusts confided to it, in the best manner for promoting the benevolent and laudable objects of its incorporation. It may further be remarked, that the effect of this act is not merely to deprive the corporation of its legal control over the charity, so far as respects the property in question, but to destroy the trusts altogether, by transferring the property to other persons, and for other uses, than those to which they were originally destined by the grant made to the society.
 

 The case chiefly relied upon by the defendants’ counsel, in support of his first point, was that of the
 
 Attorney-General
 
 v.
 
 City of London
 
 (1 Ves. jr. 247, and 3 Bro. C. C. 171), under the will of Mr. Boyle, which directed the residue of his estate to be laid out, by his executors, for charitable and other pious uses, at their discretion. They purchased, under a decree of the court of chancery, the manor of Brafferton, which they conveyed to the City of London, upon trust, to lay out the rents and profits in the advancement of the Christian religion among infidels, as the Bishop *of London, and one of the executors, should appoint, such appointment to be confirmed by a decree of the court of chancery. The trustees appointed a certain part of the rents and profits to be paid to an agent in London, for the college of William and Mary, in Virginia, for the purpose of maintaining and educating in the Christian religion, as many Indian children as the fund would support; the president, &c., of the college to transmit accounts of their receipts and expenditures yearly to the court of chancery, and to be subject to certain rules then prescribed, and to such others as should thereafter be adopted, with the approbation of the court. This appointment was ratified by a decree of the court of chancery. The object of the information was, to have the disposition of this charity taken from the college, and that the master should lay before the court a new scheme for the future disposition of the charity. The new scheme was ordered by the chancellor, upon the ground, that the college, belonging to an independent government, was no longer under the control of the court. The difference between that case and the present is, that in that, the president, &e., of the college were not the trustees appointed by the will of Mr. Boyle, or by his executors, to manage the charity, but were the mere agents of the trustees for that purpose, or rather the servants of the court of chancery, as they are styled by the counsel for the college, in the administration of the charity, subject to
 
 *216
 
 such orders and rules as might be prescribed by the trustees, and sanctioned by ^be Chancellor. The college had a mere authority to dispose of the charity, but without any interest whatever in the fund. The trustees resided in England, and there too was the fund. The president, &c., of the college derived all their authority from the trustees, and from the court of chancery. To that court, they were accountable, and were necessarily removable by the court, whenever it should appear to the chancellor to be necessary for the due administration of the charity. In the present case, the plaintiffs were, at the period of the revolution, entitled to the legal estate in the land in question, under a valid and subsisting grant; and the only question is, whether the estate so vested in them, was divested by the revolution, and became the property of the state ? We have endeavored to show that it was not.
 

 The case of
 
 Barclay
 
 v.
 
 Russell
 
 (3 Ves. 424), was also mentioned by the defendants’ counsel, and ought, therefore, to be noticed by the court. That was a claim on the part of the state of Maryland, of certain funds which had been vested in trustees in London, before the American revolution, by the old government of Maryland, in trust for certain specific purposes. The case is long, and rather obscurely reported ; but in the case of
 
 Dolder
 
 v.
 
 Bank of England
 
 (10 Ves. 352), the Lord Chancellor states the ground upon which the claim was rejected. His Lordship observes, that “ that was a case in which the old government existed under the king’s charter, and a revolution toob; place, though the new government *was acknowledged by this country. Yet, it was held, that the property, which belonged to a corporation existing under the king’s charter, was not transferred to a body which did not exist under his authority, and therefore, the fund in this country was considered to be
 
 bona vacantia,
 
 belonging to the crown. Another, and, perhaps, a more intelligible reason, is assigned in the ease itself, namely, that the funds were vested by the old government, in the hands of the trustees, by the act of 1733, for certain specific trusts, the execution of which was then rendered impossible. “ There is no specific purpose,” says the chancellor, “ that the will of the present government can point out, for which purpose, according to the original creation of the trust, I can direct the trustee to transfer. It is, therefore, the common case of a trust, without any specific purpose to which it can be applied; the consequence of which is, that the right to dispose of this money is vested in the crown.” Now, it is quite clear, that if the premises upon which this case was decided were correct, the conclusion is so. The old government was treated as a corporation, which ceased to exist as such, by the new form of government, deriving its name, its existence, and its constitution, from a totally different source from that under which the old corporation existed. The old corporation no longer existed, the consequence of which was precisely that which would take place, in case of the dissolution of any private corporation; ^leb’ ⅜⅛⅞1 rights would cease, and would not descend or pass to the new corporation. So too, if the specific purpose for which the trust was created had ceased, the disposition of the fund clearly devolved upon the crown. But in this case, the plaintiffs exist, at this day, as a corporation, precisely as it did before the revolution ; and the specific purposes to which the trust was to be applied, by the terms of the charter, still remain the same. The cases, therefore, are totally unlike each other.
 

 
 *217
 
 2. The next question is, was this property protected against forfeiture, for the cause of alienage, or otherwise, by the treaty of peace ? This question, as to real estates belonging to British subjects, was finally settled in this court, in the case of
 
 Orr
 
 v.
 
 Hodgson
 
 (4 Wheat. 453), in which it was decided, that the 6th article of the treaty protected the titles of such persons, to lands in the United States, which would have been liable to forfeiture, by escheat, for the cause of alienage, or to confiscation,
 
 jure belli.
 
 The counsel for the defendants did not controvert this doctrine, so far as it applies to natural persons; but he contends, that the treaty does not, in its terms, embrace corporations existing in England, and that it ought not to be so construed. The words of the 6th article are,
 
 “
 
 there shall be no future confiscations made, nor any prosecutions commenced, against any person or persons, for or by reason of the part which he or they may have taken in the present war; and that no person shall, on that account, suffer any future *loss or damage, either in his person, liberty or property,” &c. The terms in which this article is expressed are general and unqualified, and we are aware of no rule of interpretation applicable to treaties, or to private contracts, which would authorize the court to make exceptions by construction, where the parties to the contract have not thought proper to make them. Where the language of the parties is clear of all ambiguity, there is no room for construction. Now, the parties to this treaty have agreed, that there shall be no future confiscations, in any case, for the cause stated. How can this court say, that this is a case where, for the cause stated, or for some other, confiscation may lawfully be decreed ? We can discover no sound reason, why a corporation existing in England may not as well hold real property in the United States, as ordinary trustees for charitable or other purposes, or as natural persons for their own use. We have seen, that the exemption of either, or all of those persons, from the jurisdiction of the courts of the state where the property lies, affords no such reason.
 

 It is said, that a corporation cannot hold lands, except by permission of the sovereign authority. But this corporation did hold the land in question, by permission of the sovereign authority, before, during and subsequent to the revolution, up to the year 1794, when the legislature of
 
 Vermont
 
 granted it to the town of New Haven ; and the only question is, whether this grant was not void *by force of the 6th article of the above treaty? We think it was. Was it meant to be contended, that the plaintiffs are not within the protection of this article, because they are not persons who could take part in the war, or who can be considered by the court as British subjects ? If this were to be admitted, it would seem to follow, that a corporation cannot lose its title to real estate, upon the ground of alienage, since, in its civil capacity, it cannot be said to be born under the allegiance of any sovereign. But this would be to take a very incorrect view of the subject? In the case of the
 
 Bank of the United States
 
 v.
 
 Deveaux (5
 
 Cranch 86), it was stated by the court, that a corporation, considered as a mere legal entity, is not a citizen,- and therefore, could not, as such, sue in the courts of the United States, unless the rights of the members of it, in this respect, could be exercised in their corporate name. It was added, that the name of the corporation could not be an alien or a citizen ; but the
 
 *218
 
 corporation may be the one or tbe other, and the controversy is, in fact between those parties and the opposing party.
 

 But even if it were admitted, that the plaintiffs are not within the protection of the treaty, it would not follow, that their right to hold the land in question was divested by the act of 1794, and became vested in the town of New Haven. At the time when this law was enacted, the plaintiffs, though aliens, had a complete, though defeasible, title to the land, of which they could not be deprived *for the cause of alienage, but by an inquest of office ; and no grant of the state could, upon the-principles of the common law, be valid, until the title of the state was so established.
 
 (Fairfax's devisee
 
 v.
 
 Hunter's lessee,
 
 7 Cranch 503.) Nor is it pretended by the counsel for the defendants, that this doctrine of the common law was changed by any statute law of the state of Vermont, at the time when this land was granted to the town of New Haven. This case is altogether unlike that of
 
 Smith
 
 v.
 
 State of Maryland
 
 (6 Cranch 286), which turned upon an act of that state, passed in the year 1780, during the revolutionary war, which declared, that all property within the state, belonging to British subjects, should be seized, and was thereby confiscated to the use of the state ; and that the commissioners of confiscated estates should be taken as being in the actual seisin and possession of the estates so confiscated, without any office found, entry, or other act to be done. The law in question passed long after the treaty of 1783, and without confiscating or forfeiting this land (even if that could be legally done), grants the same to the town of New Haven.
 

 3. The last question respects the effect of the late war between Great Britain and the United States, upon rights existing under the treaty of peace. Under this head, it is contended by the defendant’s counsel, that although the plaintiffs were protected by the treaty of peace, still, the effect of the last war was to put an end to that treaty, and, consequently, to civil rights derived *under it, unless they had been revived and preserved by the treaty of Ghent. If this argument were to be admitted in all its parts, it nevertheless would not follow, that the plaintiffs are not entitled to a judgment on this special verdict. The defendants claim title to the land in controversy, solely under the act of 1794, stated in the verdict, and contend, that by force of that law, the title of the plaintiffs was divested. But if the court has been correct in its opinion upon the two first points, it will follow, that the above act was utterly void, being passed in contravention of the treaty of peace, which, in this respect, is to be considered as the supreme law. Remove that law, then, out of the case, and the title of the plaintiffs, confirmed by the treaty of 1704, remains unaffected by the last war, it not appearing from the verdict, that the land was confiscated, or the plaintiffs’ title in any way divested, during the war, or since, by office found, or even by any legislative act.
 

 But there is a still more decisive answer to this objection, which is, that the termination of a treaty cannot divest rights of property already vested under it. If real estate be purchased or secured under a treaty, it would be most mischievous to admit, that the extinguishment of the treaty, extinguished the right to such estate. In truth, it no more affects such rights, than the repeal of a municipal law affects rights acquired under it. If, for example, a statute of descents be repealed, it has never been supposed, that
 
 *219
 
 rights of property ““already vested during its existence, were gone by such repeal. Such a construction would overturn the best established doctrines of law, and sap the very foundation on which property rests.
 

 But we are not inclined to admit the doctrine urged at the bar, that treaties become extinguished,
 
 ipso facto,
 
 by war between the two governments, unless they should be revived by an express or implied renewal on the return of peace. Whatever may be the latitude of doctrine laid down by elementary writers on the law of nations, dealing in general terms, in relation to this subject, we are satisfied, that the doctrine contended for is not universally true. There may be treaties of such a nature, as to their object and import, as that war will put an end to them ; but where treaties contemplate a permanent arrangement of territorial, and other national rights, or which, in their terms, are meant to provide for the event of an intervening war, it would be against every principle of just interpretation, to hold them extinguished by the event of war. If such were the law, even the treaty of 1783, so far as it fixed our limits, and acknowledged our independence, would be gone, and we should have had again to struggle for both upon original revolutionary principles. Such a construction was never asserted, and would be so monstrous as to supersede all reasoning. We think, therefore, that treaties stipulating for permanent rights, and general arrangements, and professing to aim at perpetuity, and to deal with the case of war as well as of peace, do not cease on the occurrence of war, but are, at most, only suspended *while it lasts; and unless they are waived by the parties, or new and repugnant stipulations are made, they revive in their operation at the return of peace.
 

 A majority of the court is of opinion, that judgment upon this special verdict ought to be given for the plaintiffs, which opinion is to be certified to the circuit court.
 

 Certificate for the plaintiffs.