Mr. Chief Justice Sharkey,
delivered the opinion of the court.
The several cases which have been argued, and submitted together as involving the construction and validity of the act of the legislature passed in 1846, entitled “ an act to amend an act entitled an act to prescribe the mode of proceeding against incorporated banks for a violation-of their corporate franchises, and against persons pretending to exercise corporate privileges under acts of incorporation, and for other purposes,” passed July, 1843, so far as it was designed to operate on the assets and property of banks whose charters had been declared forfeited before the passage of the act, have been carefully examined, in view of the objection, that they were not properly before this Court. We certainly do not desire to decide any case which is not properly before us, but we have no wish to evade a decision on the merits of any case that is regularly here. And although it was suggested, that in view of the importance of the question, it ought to receive further discussion on being directly presented to the court, yet we apprehend that but little could be added to the lengthy and able discussions which have been bestowed upon the question by the counsel on both sides.
All of the cases were not properly brought up, but some of them are regularly in this court, and do undoubtedly present the whole question, and from their present attitude, require absolutely that it should be decided. To this class belongs the case of the Commercial Bank of Natchez v. Chambers et al. as will be manifest by stating its condition.
The Commercial Bank brought suit on a promissory note made by Chambers. At the October term, 1842, of the circuit court of Scott county, judgment was rendered in favor of the defendant; the bank sued out a writ of error returnable to the January term, 1844, of this court, pending which, to wit, in June 1845, the corporation was dissolved by judgment of forfeiture. The writ of error must therefore abate, unless there be some one who can prosecute it. The trustee appointed by the court, under the act of 1843, when the judgment of forfeiture was pronounced, now comes into court and suggests in writing the dissolution of the corporation, and moves to have the suit revived in his *45 name as trustee. In support of his motion he produces the judgment of forfeiture rendered against the bank, at the June term, 1845, of the circuit court of Adams county, which judgment also shows that at the same time he was appointed trustee, and he admits that he has been ordered to sell under the act of 1846. Prior to the passage of the act of 1846, we decided that the trustees appointed under the act of 1843, on the dissolution of a corporation, were entitled to have all suits revived in their names which had been instituted by the corporation, and were pending at the time of the forfeiture. The act of 1843 authorizes them to sue,' and having such right, they of course had a right to prosecute suits then pending. This right, the trustee then undoubtedly had prior to the passage of the act of 1846, and the question is, does it still exist, or has it been taken away by the last mentioned act, the construction of which is necessarily involved. A right to revive a suit necessarily embraces the right to prosecute it to final judgment, and to receive the proceeds under execution, just as such power is embraced in a right or authority to institute suits. If this trustee can have this suit revived, it must be under the act of 1843 ; the act of 1846 gives no such power, either directly or by intendment; on the contrary, such power is unnecessary and repugnant to the duty which it requires the trustees to perform. It does not require them to collect, but impliedly forbids it. Its provisions are that the trustees shall return an inventory of the property and evidences of debt, to the court, and then, under an order of court, to proceed to sell to the highest bidder for cash, all the property and evidences of debt specified and set forth in the inventory, including bills receivable, notes, judgments, decrees, and all other evidences of debt, at certain specified places, on giving ninety days notice. It is mandatory in its terms, and leaves no discretion with the, trustee. He cannot collect even the amount of a judgment, nor is he authorized to receive payment, if voluntarily . tendered, but he is to sell everything. Having no power to collect money by execution, there is no necessity for reviving under this act; it did not contemplate any such thing. If it is to prevail, this motion to revive cannot be sustained; but if *46 the act of 1843 is to prevail, then the motion must be sustained. An act of the legislature which is inconsistent with the provisions of a former act, repeals the former by implication from necessity, although it may not profess a repeal; and this must be the effect of the act of 1846 on that of 1843, unless constitutional rights interpose barriers to such an effect.
It was suggested in argument that possibly both acts might stand, by so construing them as to make them harmonize. It is true, that we ought to follow that rule of construction which requires that acts seemingly repugnant, shall still be regarded as consistent if such construction can be fairly given them. In the present instance, nothing short of an unfair and forced construction, could produce such a result. The two acts are not only repugnant, but the latter seems to have been designed to abrogate that provision of the former, which w*e are now called on to enforce. By the act of 1843, the trustees are authorized to take charge of the assets; to sue for and collect the debts due the bank, and to sell and dispose of the property, without any restriction as to the manner of such sale. By the act of 1846, the trustees are required positively to sell all property and all rights held by the bank. The trustees under the first act had discretion, and a much more extensive power; they could sell the property as they might think best. Under the last act, they have no discretion, and are deprived of the important power of suing and collecting. This act creates but a limited agency; the first created a trustee. As they are thus inconsistent, the one or the other must be inoperative. The last is said to be in conflict with the constitution in several particulars, and to that extent, void. If that be so, the act of 1843 is still the law. We shall proceed, therefore, to inquire into the validity of the act of 1846, in its application to rights, which accrued under the forfeiture of the bank charier, which occurred before its passage.
It is said to be in conflict with the constitution in several particulars; that it is retrospective and destroys vested rights ; that it violates the obligation of contracts, and that it also violates the fourteenth section of'the bill of rights, which declares “ that *47 all courts shall.be open, and every person, for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice administered, without sale, denial or delay.”
As the validity of the act is attacked, because it violates constitutional rights, the inquiry seems to give rise to three questions : First, what were the rights of any and all parties in interest, of the state as well as individuals, under the act of 1843, either by the express declaration of that act, or as resulting consequentially from it, independently of such express declarations? Second, how and to what extent have the rights which existed under the law of 1843, been changed by the law of 1846? and third, as to the power of the legislature to make such changes.
.First, with regard to the rights of all parties under the act of 1843, either as directly declared, or as resulting necessarily from it. It was said, in argument, with much plausibility, that even without the interposition of the-legislature, the debts due to and from the bank, would have survived its dissolution; that these commercial corporations should be regarded as partnerships, and the fund or property owned by them a trust fund, which equity would appropriate to the payment of their debts. The current of decisions seems to have fallen into a different channel, and it may now be regarded as the settled doctrine, that on the dissolution of a banking corporation, the debts due to and from it are extinguished; not by any implied condition in the contracts, but from necessity, because there is no person in whose favor, or against whom they can be enforced. But to proceed. What then were the rights which accrued under the act of 1843 ? The question is intended to embrace something more than the rights expressly given. The act was designed to prescribe a mode of proceeding against corporations for violations of charters. To avert the consequences which it was supposed would follow a dissolution of the corporation, the legislature provided by the eighth section, that upon judgment of forfeiture, the debtors of such bank should not be released by such judgment from their debts and .liabilities, but that it should be the duty of the court to appoint one or more trustees to take charge of the books and *48 assets; to sue for and collect all debts due to such bank, and to sell and dispose of its property; and the proceeds of the debts when collected, and of the property, to apply, as might thereafter be directed bylaw, to the payment of the debts of such bank. This act is called the grant, or assignment of all the rights which now exist. It contains two propositions: first, that the debts due to the bank should not be extinguished; and second, that they should be applied to the payment of the debts due from the bank. In the outset, we cannot admit the entire correctness of the argument, on which more than one of the counsel! aid much stress, that there are no other rights, either in the trustee or creditors, than such as are expressly given by the act. By saying that the trustee should apply the proceeds, as might thereafter be directed by law, to the payment of the debts of the bank, the legislature did not make an appropriation in favor of creditors. It gave nothing, for the best of all reasons; it did not own the debts due the bank, and, therefore, could not give them to the creditors. If it had professed to give nothing, it is believed that the result, so far as the right is concerned, would not have been materially different from what it is. To be more explicit; suppose the legislature had said the debts due to and from the bank shall not be extinguished, and had stopped there, how would the rights of debtor and creditor have stood then 1 The contracts would have been saved, and the obligations in full force. The rights of the creditor would have been thereby saved, and the liability of the debtor would also have continued to exist. The only question is as to the remedy, and it is said there is no right without a remedy, and this is true. When the law is inadequate, equity supplies its deficiencies, by furnishing an appropriate remedy. If there be a right, in the legal sense of that term, as contradistinguished from a right in morals, then, either in law or in equity is there a remedy. Let us suppose the legislature to pass an act, with no other object in view than a mere repeal of so much of the common law, as extinguishes the debts of a corporation on its dissolution. It would seem to follow, as a consequence of such repeal, that the debts would still exist, and yet they would not if there was *49 no remedy, for there is no debt in a legal sense unless it can be enforced; and the consequence would be that the legislature cannot repeal that part of the common law, without also providing a remedy. But is it not true that when the contract is saved in full force, the existing law furnishes a remedy? The debts due to the bank, are sometimes regarded as constituting a trust-fund for the payment of debts due from it; but whether that be true to the full extent of a strict trust or not, is not material; it is enough if it be a fund which equity would appropriate for the benefit of creditors. Such was the principle of Wood v. Dummer, 3 Mason, 308, and Robins v. Embry, 1 S. & M. Ch. R. 207. If the creditor should happen to have a judgment, the remedy would be obvious enough. But very clearly, if in such a repealing law, provision had also been made for the appointment of a trustee to take charge of the assets without directing what he should do with them, the remedy would have followed. It is not true then, that all rights are derived from that part of the law which, in terms, declares that the assets shall be applied to the payment of debts. Strike from it these words, “ and the proceeds of the debts when collected, and of the property when sold, to apply, as may hereafter be directed by law, to the payment of the debts of such bank or banks, corporation or corporations,” and creditors would still have recourse against the funds. By saving the debts from extinction, and providing for the appointment of a successor, the existing law attached the trust, or remedy.
In the further consideration of the effect of this law on the present question, we must bear in mind, that two of its prominent features, have, after a very full investigation, received a judicial construction, in the case of Nevitt v. The Rank of Port Gibson, 6 S. & M. 513. We decided, that the law conferred authority and imposed duties on the trustees, which could only be executed by investing them with the legal ownership of the property; and that they can maintain actions at law. We also decided that the act, in effect, declares the assets to be a trust-fund for the payment of debts, which would be enforced in a court of equity, without any further legislation; and that *50 if the legislature were to attempt to apply them to any other purpose than the payment of the debts of the corporation, it would transcend its constitutional limits. We still adhere to this construction of the act. The trustee then had the legal title, or succession cast upon him. His condition is not materially different from that of a trustee appointed by contract. As a general principle the legal title vests in a trustee, whilst the equity is in the cestui que trust. By the act he is called a “trustee,” and the meaning of the term, was doubtless well understood; it does not create a mere agency, and if the legislature can repeal his authority, why can they not that of any other trustee 1 There is a trust-fund, a use to which it is to be applied, and a trustee to apply it; that is precisely the character of all trusts. The term was appropriate, and used, as we must suppose, understandingly. When a trustee is once appointed, he is amenable to judicial authority only. A court of chancery may remove him for an abuse of the trust, or it may compel him to perform it. The title of the creditors is equally clear. It resulted as a necessary consequence from the declaration, that the debts due the bank, should not be extinguished, and that a trustee should be appointed to receive them; it was recognized and strengthened by the declaration, that the trustee should apply the funds to the payment of the debts of the bank. Although the act does not, in so many words, say that the debts due from the bank shall not be extinguished, yet, this is the necessary consequence of what is said. The debts due the bank could have been kept alive for no other purpose, and besides, the declaration that the funds should be applied to the payment of debts, necessarily kept the claims of creditors in existence to receive the fund; and so it is too with regard to property; the intention was to save all for the benefit of creditors, which is manifest, as the property was to be converted into money. But the legislature had no power to appropriate the funds to any other purpose; that is a point expressly decided in Nevitt’s case. The common law might have been left to operate in extinguishing the debts by a dissolution of the bank, but the very moment they were saved *51 from annihilation, their destiny was fixed. But supposing it to have been within the power of the legislature to change that destiny, it is still perfectly apparent that no such thing was intended; and if legislative intention is worth anything in the construction of a law, it must place the rights of creditors beyond dispute in this instance, so far as the legislative power over the assets extended. When the legislature declared that “ the proceeds of the debts when collected, and of the property when sold” should be applied to the payment of debts as might thereafter be directed by law, a beneficial interest then vested in creditors, even if none would have vested without such declaration, and by interposing a trustee, the creditors had also a remedy by which to enforce their rights.
Let us now look at the condition of things as produced by the act of 1843. The bank had violated the conditions of its charter, and judgment of forfeiture was pronounced against it. It had property and debts due to it. There were also claims against it. The common law, which would have extinguished such debts on both sides, had been repealed; it was not the law of the land that the debts due to and from a corporation should be extinguished. The contracts were preserved in full vigor, and the property did not revert to the original grantor, or to the state. The law required that a trustee or successor should be appointed; this was done, and he thereby acquired the legal title to the property and choses in action. He became in law the owner; he could sue and collect, and sell property. The funds in his hands were subject however to a trust; creditors had a vested beneficial interest in them. They were held by the trustee but to be applied to the use of creditors. Having an equitable interest, creditors had also a remedy; they could resort to a court of chancery to compel the trustee to discharge his duty by collecting the funds, and then, by paying them over, under the direction of the court of chancery. No further legislation was required. The right and the remedy both existed; the one was perfect, and the other was adequate. It would seem to require something more than the exercise of legitimate legislative .power to break up this connection — to *52 produce a total change in the existing rights of the parties, by taking away entirely the remedy of the creditor, and by compelling the trustee to sell his legal title. Yet such power is claimed for the legislature; it was made to rest on these words in the law, to wit: “ and the proceeds of the debts, when collected, and of the property, when sold, to apply, as may hereafter be directed by law, to the payment of the debts,” &c. In this language, it is argued, there was a reservation of power to give future directions by law with regard to the disposition of the assets. If the state reserved power over this property, or the assets, she must have possessed it, for nothing can be reserved which was not possessed. If anything more than ordinary legislative power can be exerted over this fund, or the choses in action, it must be in virtue of some right of property in the state. Surely, if she has no right of property, she possesses nothing more than a general legislative power, to be exercised only as it is on the property or rights of individuals. Let us briefly, then, inquire into the rights of the state, in this respect. None can be asserted in consequence of any power the state may be supposed to have had over the bank; the bank had ceased to exist, and any power over it must have also ceased. But the property and rights were left. The state had withdrawn the portion of power which it had delegated.to the corporation, and the relation that had once existed between the legislature and the bank, no longer existed. It cannot be that, because this property once belonged to the bank, that more than ordinary power can be claimed over it. Nor does such power exist merely because provision was made that the rights should survive the dissolution ; that would be to assume that the state had a right to appropriate it by legislative act to her own use, which is denied. There is no such thing as a legislative appropriation of property in this country. If it can be shown that the state had no interest whatever in the choses in action, and the real estate, then it will follow that none other than a general legislative power existed over them. The state could have acquired no right on the ground of forfeiture. The constitution declares that no conviction for an offence, shall work a forfeit *53 ure of estate. The legislature cannot, in the face of this provision, pass a law of forfeiture for offences, nor can it pass an act to transfer property. It is the province of the judiciary to declare the ownership of property in virtue of some preexisting rule or law; and no judicial determination had been pronounced, giving title to the state. No right whatever can be claimed-under the common law to the choses in action, or the real estate. Suppose that law to have been in full force, what is the consequence? By that the real estate would have reverted to the grantor, not to the state; nor could she control it more than other property, for the moment the forfeiture was declared the title would have passed by operation of law to the grantor. The personal property, the state would have been entitled to, and could have disposed of; but she could have acquired no right to the choses in action; they would have been extinguished. Then if there be any such right as that claimed, it must result from the act of 1843. The most obvious answer to this is found in the want of intention in the legislature to vest the property in the state, even if it had possessed the power to do so. There is nothing in the act which professes, either directly or indirectly, to confer any right of property on the state, either absolutely or conditionally. The state did not, nor could she, acquire any right of property by the common law, and she evidently acquired none by statute; it transfers no right, which it should have done if any was intended to be secured, by it; because as the state had no right, independently of the statute, some act of transfer was necessary, as without it nothing could be acquired. Then how, it may be asked, does the particular clause under consideration amount to a reservation of power, when nothing was possessed to reserve. How does it amount to a conditional gift, when the state had nothing to give? If it is tobe construed as amounting to anything more than a reservation of general legislative power, it is void, for nothing more was possessed to reserve; and if it amounts only to a reservation of a right to legislate in regard to these rights, it was unnecessary ; such right is always in the legislature, unless it has been expressly parted with. For all practical purposes, then, *54 this clause might as well have been left out of the statute, so far as it is attempted to be made the source of authority to the legislature. It neither confers nor reserves power which would not have been possessed without it. In virtue of the right of eminent domain, the state may appropriate private property to public uses, but this can only be done on just compensation first made. The right is not predicated on this ground, nor is it derived from the law of escheats, which does not operate to the prejudice of creditors ; its application is not asserted in the present instance. We are totally at a loss then to perceive how a deduction is to be drawn in favor of a right of property in the state, either past or present; and need we repeat that, without such right, anything more than general legislative power over it cannot exist. Like other property, it is to be held and transmitted by laws prescribed within the acknowledged sphere of legislation; it is subject to nothing more. The common law might have been left to operate, and its consequences would have followed. But the rights were preserved, and when that effect was produced, private interests in them attached, or rather never were removed, because the obligation of the contracts never were interrupted. As the property and debts survived the institution they retained all their incidents. The ownership was somewhere, and wherever it was, it was a private, not a public right; and as such it was protected by the constitution, subject only to such legislative authority as may be exercised over every individual in the community.
But suppose it to be admitted that the state once had such right as that claimed, what follows? She has parted with it. The act of 1843 expressly declares that it shall be applied to the payment of debts. We have decided that under this provision such a trust was raised as would be enforced in favor of creditors in equity, without further legislation. We could not so have decided if the state had reserved the right. Notwithstanding this decision it is argued that there was still a power of control, but this would be inconsistent with the equity of creditors. When the state parts with property, even by donation, it becomes a contract, and is beyond her control. Private *55 rights are then vested, which cannot be divested. The state gave the franchise to the corporation, but had no power to withdraw it at pleasure; it required a forfeiture of the condition to enable this to be done.
Second. Having thus endeavored to show to what.extent rights were vested under the act of 1843, and in whom, we come, in the next place, to inquire how and to what extent these rights are changed by the act of 1846. By the first section the trustee is required to give bond conditioned to perform the duties required by that act. By the 9th section of the first act, he was required to give bond conditioned for the diligent collection of the debts, and the sale of the property. If the bond under the first act enured to the benefit of creditors, it might be a serious question whether any discharge from the obligation could be made, except by those for whose benefit it was intended. The second section of the act of 1846, makes it the duty of every person holding property belonging to the bank, to deliver it to the trustee, and a refusal to do so is made a contempt of court. This is the substitute for the right to sue for property given by the first act. It is a summary remedy, and certainly confers great power on the court, and it might seem a harsh and unauthorized one if the possessor of property should interpose a claim to hold it. The third section makes it the duty of the trustees to return an inventory of all rights and property, at the first term of the court after their appointment. The fourth section gives rise to the principal point involved in this case. It provides that the trustees, under the order of court, shall sell for cash to the highest bidder, all the property and evidences of debt set forth in the inventory, at certain specified places, on giving ninety days’ notice of such sale. By the eleventh section it is declared that all the provisions of the act shall extend to trustees previously appointed under the act of 1843. Here then is a plain declaration that the act was intended to apply to trustees appointed on forfeitures which had been previously declared. Consequently such trustees were imperatively required to sell, at public sale, property to which they held the legal title, whether it was in their possession or not. It deprives them of *56 their right to sue on the choses in action. But the most important change is made in the rights of creditors. Their obligations were in full force under the act of 1843: the fund was declared a trust fund for their benefit — they had an interest in it, and consequently a right to have it collected — they had power to compel the trustees to perform their duty in the collection— and then they had an adequate remedy to enforce the payment of their notes, bills or bonds, out of the trust fund. By the last,act every right they had is swept away. They are compelled to submit to a sale of the property in which they had an interest, and indeed on which they had a lien, for that is the effect of a trust. They have no power over the trustee. They have obligations confessedly subsisting, without any remedy to enforce them. They cannot sue, as they could before, either at law or in equity. The power to sue a trustee in equity, arises out of the duty he is under to apply the fund in payment of the debt. It is a proceeding to enforce a lien upon the fund. When that duty ceases, by giving a different direction to the fund, the remedy is at an end; the lien is destroyed. Nothing is a legal remedy unless it can be carried out by process of execution. These changes are important and striking, and this brings us to inquire,
Third, as to the power of the legislature to declare these changes. When any vested right is taken away, or the obligation of any contract is impaired, the act is so far void. It requires no argument to prove that the legislature cannot interfere with vested rights in such a way as to destroy them. Remedies may be provided in aid of them, but any legislative act which destroys a right, or transfers it from one to another, against the will of the owner, is void. The fundamental principles of government forbid it. It is beyond the legitimate power of the legislature. A retrospective statute, affecting and changing vested rights, is very generally considered in this country, says Chancellor Kent, as founded on unconstitutional principles, and consequently inoperative and void. 1 Kent, 455. This too was the doctrine announced in the case of Dash v. Van Kluck, 7 Johns. 477, in which the effect of retrospective statutes *57 was very much discussed. And in 8 Wheaton, 493, it was said that if rights be acquired under a law, they are not changed or lost by its repeal. The language of Judge Story, in the case of Wilkinson v. Leland, 2 Peters, 276, is worthy of being quoted. He says, “ That government can scarcely be deemed to be free, where the rights of property are left solely dependent upon the will of the legislative body,, without any restraint. The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred. At least no court of justice in this country would be warranted in assuming that the power to violate and disregard them, a power so repugnant to the common principles of justice and civil liberty, lurked under.any general grant of legislative authority, or ought to be implied from any general expressions of the will of the people.” But it must be useless to multiply authorities. The people 'of this country understand very well that there is no power in the legislature to take from them that which they own. They know that they have delegated to the legislature all the power it possesses, and no such authority has been granted. We have seen then that important rights were vested in the creditors of the bank, both before and after the act of 1843; we have also seen that those rights have been materially changed by the legislature; that.they have been actually deprived of all remedy; and we have lastly seen that the legislature possesses no such power. But it has been said there is no such thing as a vested right in a remedy. That is not understood to be the doctrine where the enjoyment or possession of a right, depends upon the remedy. It is true that there is no vested right in any particular remedy; the form of the remedy may be changed. But if it were even true that there is no such thing as a vested right in a remedy, the further question arises, — if the remedy is taken away, is not the obligation of the contract impaired ? It will be sufficient to quote the language of Judge Story, and apply it to the present case. He says, “ Although there is a distinction between the obligation of a contract and a remedy upon it; yet, if there are certain remedies existing at the time when it is made, all of which are afterwards *58 wholly extinguished by new laws, so that there remain no means of enforcing its obligation, and no redress, such an abolition of all remedies, operating in presentí, is also an impairing of the obligation of such contract. But every change and mod-ideation of the remedy does not involve such a consequence. No one will doubt, that the legislature may vary the nature and extent of the remedy, so always, that some substantive remedy be in fact left.” 3 Story’s Com. on Con. 250. The rule has been even more strictly administered than here laid down, in the more recent decisions of the supreme court. Valuation or appraisement laws have been held to impair the obligation of the contract, because of the delay they produced. It cannot admit of question that where the remedy is entirely taken away, the obligation is impaired. The obligation is the duty which the obli-gor is under to perform the contract, and if the remedy be taken away, the legal obligation is destroyed. The state is bound to furnish a remedy by law for the enforcement of every right of the citizen. When the creditors of the bank entered into the contracts with it, the existing laws furnished a remedy at law. When the forfeiture was declared, the debts were not extinguished, but remained in full force, but the form of the remedy was necessarily changed. A trustee was provided for, and a fund set apart for the payment of debts. That trustee was invested with a legal right to sue. This was a grant of power which is equivalent to a contract; no grant can be impaired.
But the creditors were also clothed with a remedy; they could proceed to enforce their contracts on the fund through the trustee. The late law deprives them of kll remedy. They cannot sue on their contracts, although they are unimpaired, except by the privation of a remedy. The obligation is certainly impaired. But to this objection it was answered tha<t the sale directed by the 4th section is a remedy, but that is not so. It does not enforce the contract, on the contrary, it defeats its enforcement. A remedy is a legal demand of one’s right in a court of justice. It consists in a right to have the contract enforced by a judgment at law. In a legal remedy, the party is an actor, but here he is not. This sale has none of the characteristics of a legal remedy.
*59 Having given our view of the questions involved, it remains to answer some of the arguments of counsel addressed to ns. It was said that no trust was created, no rights vested in any particular creditor, and consequently that no right was divested. This argument overlooks the decision in Nevitt’s case. We held, that the fund was a trust-fund for the payment of debts, and that it would be enforced in a court of chancery. It is now too late to say that no equity vested, or that no trust existed, or that it was so imperfect that it could not be enforced. But another of the counsel said this question was not directly involved in Nevitt’s case, and that the decision of the point is not binding. This is a mistake ; it arose directly on the validity of the law, and was as directly decided.
It was again said, that as the state saved this property for creditors, she had a right to reserve power to control it, and did do so, by directing thát it should be paid as might afterwards be directed by law. The truth of this proposition is not admitted. The state saves all our property by providing laws for its recovery, and its enjoyment. If I save the vessel of a mariner from sinking, I do not thereby acquire a right of property in the vessel, nor do Tacquire a right to manage the helm. It is the highest duty of the state to save and protect the rights of individuals, but this does not enlarge her power over the particular thing which has received protection. The social compact contains no such principle as that extraordinary and unauthorized power may be exerted in consideration of the discharge of an act of duty. All delegated power finds its limit in the constitution, and no benefit bestowed on a particular class of individuals, will authorize a relaxation of constitutional restrictions as to them.
It was insisted also, that the trustee was only invested with a power which is subject to revocation. . The case of a note transferred to an agent or attorney for collection, was given as an illustration. In the supposed case there is no transfer of the legal title. An attorney must bring suit in the name of his principal. But there is this further obvious distinction. No use vests in any one, the beneficial interest still remains in the *60 individual who transferred the note. But that is again begging the question. When did the state get her right to transfer either with power of revocation, or without it. The truth is the state had no right of property; neither was it suspended, or held in abeyance; but vested immediately, the legal title in the trustees, and the beneficial interest or equity, in the creditors, and that consequently it was subject only to the general authority of the legislature, as other rights of a similar character are. It was then irrevocable.
But the main ground taken in argument, was that the legislature has a right to direct the trustees to sell, because they are agents of the state, or public officers, in proof of which, it is made embezzlement in them to misapply the funds. The legislature may make it embezzlement in any private trustee to squander or waste the funds entrusted to his keeping. The argument would be conclusive, if the property and assets belonged to the state; but if it be private property, it would be difficult to maintain that the legislature has power to direct the agents of the state to sell it. The state may control her own agents, but she cannot authorize them to seize and sell private property. Another of the counsel insisted however, that they were not public agents, but private trustees, and that as trusts are cognizable in equity, both the laws are void, because they confer power on the circuit courts to appoint trustees. We fully concur in thinking they are private trustees; we do not think they can, with any plausibility, be regarded as public officers. But we cannot concur in thinking either of the acts void, merely because they confer power on the circuit courts to appoint trustees. Trustees may be appointed by parties, or by courts of law, or even by the legislature for public purposes; but when appointed by the parties, or by a court of law, they are amenable to a court of chancery. That court- never appoints a trustee, except when there is a trust, and no trustee to manage or perform it. By the act of 1844, provision was made for putting the Planters Bank in liquidation, by proceedings in chancery through a trustee. In the case of that Bank v. The State, 6 S. & M. 628, we decided that notwithstanding this *61 remedy, the courts of law might still proceed under the act of 1843, against that bank, in case no proceeding had been instituted under the act of 1844; thus indicating our opinion, that a trustee still might be appointed by a court of law.
It was pressed in argument that no rights were violated, — no contract impaired. Let us put the case of Routh & Williams v. The Commercial Bank of Natchez, which is one of the cases submitted, to prove that the rights of debtors are violated as well as the rights of creditors. The plaintiffs had a judgment rendered against them for over $100,000, in which it is said there was error, and that they are not in law bound to pay it. They prosecuted a writ of error to reverse the judgment, which was actually pending in this court, when the act of 1846 was passed. It does not provide that suits may be brought by, or revived in the name of, or against the trustee. If they cannot revive against the trustee, their writ of error must abate, the inevitable consequence of which is an affirmance of the judgment; it is equivalent to an affirmance of the judgment. Then a judgment stands against them, which is to be sold by the trustee, and which of course they would be bound to pay to the purchaser. This law makes a contract for them, and affirms a judgment on that contract. It imposes an obligation which they say does not exist. It takes away from them a suit pending, which is made a matter of right. This does not seem to be in keeping with that provision in the constitution which declares “ that all courts shall be open, and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay.”
We have thus endeavored to give our view of the question involved, as well as to attempt a very brief reply to some of the prominent arguments of counsel. Our conclusion is, that, that portion of the act of 1846, relating to the sale of the property and assets of banks, cannot operate as to the banks whose charters had been forfeited, and trustees appointed under the act of 1843, prior to the passage of the last act. The motion to revive must consequently be sustained.
*62 Mr. Justice Clayton concurred in the conclusions of Chief Justice ShaRKEy, for reasons to be thereafter filed.