Tommaso ARGENTO, Appellant,

v.

Herbert A. HORN, U. S. Commissioner, Xavier North, U. S. Marshal, Folco Zugaro, Consul of the Republic of Italy, Appellees.

No. 12824.

United States Court of Appeals
Sixth Circuit.

Feb. 12, 1957.

Creighton E. Miller, Cleveland, Ohio, Anthony R. Fiorette, Cleveland, Ohio, on brief, for appellant.

Martin A. Rini, Cleveland, Ohio, Sumner Canary, Cleveland, Ohio, on brief, for appellees.

Before SIMONS, Chief Judge, and McALLISTER and STEWART, Circuit Judges.

STEWART, Circuit Judge.

Upon application of the Republic of Italy, certified by the Secretary of State of the United States, and upon complaint of the Italian Consul for Ohio and Kentucky, extradition proceedings were initiated against the appellant in the United States District Court for the Northern District of Ohio. After a hearing pursuant to 18 U.S.C.A. § 3184, the United States Commissioner concluded that the evidence was sufficient to sustain the charge that the appellant was the same Tommaso Argento who

had been convicted *in absentia* and sentenced to life imprisonment in Italy in 1931 for a murder committed there in 1922.[1] The Commissioner accordingly committed the appellant to custody pending surrender to the Republic of Italy. By writ of habeas corpus and action for declaratory judgment, the appellant attacked the legality of his arrest, commitment and detention. This appeal is from the judgment of the district court upholding the Commissioner's order.[2]

Appellant's primary demand for freedom is based upon a most fundamental contention. It is his claim that there exists no valid extradition treaty between the United States of America and the Republic of Italy, and that in the absence of such a treaty, there is no legal authority for the surrender to Italy of a fugitive in the United States. The appellant also contends that several items of evidence were improperly admitted by the Commissioner, and that if they had been excluded, there would have been no evidence to connect him with any crime committed in Italy.

Without question the appellant is on sound ground in asserting that he cannot be extradited to Italy in the absence of a valid treaty so providing. That the Executive is without inherent power to seize a fugitive criminal and surrender him to a foreign nation has long been settled. Valentine v. United States, ex rel. Neidecker, 1936, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5; see Factor v. Laubenheimer, 1933, 290 U.S. 276, 54 S.Ct. 191, 78 L.Ed. 315.

While Congress might conceivably have authorized extradition in the absence of a treaty, it has not done so. The law is clear. Title 18 U.S.C.A. §

[1]. Since the Italian conviction was *in absentia*, the Commissioner correctly treated the case as though the appellant had been charged with and not convicted of a crime in Italy. See IV Hackworth, Digest of International Law (1942) 52, 132.

[2]. This is an appeal only in the declaratory judgment action, no appeal having been taken from the court's denial of a writ of habeas corpus, Argento v. North, D.C.1955, 131 F.Supp. 538. The propriety of an action for declaratory judgment to test the legality of a completed extradition hearing is open to serious question. For purposes of this case, however, we shall assume all questions considered by the district court are properly before us.

3181, states, "The provisions of this chapter relating to the surrender of persons who have committed crimes in foreign countries shall continue in force only during the existence of any treaty of extradition with such foreign government." This condition is repeated in 18 U.S.C.A. § 3184, making the provisions of that section operable only "whenever there is a treaty or convention for extradition between the United States and any foreign government."

As to the existence of a valid extradition treaty between the United States and Italy, the parties are in agreement upon the underlying facts. They differ completely in the conclusions to be drawn from them.

A treaty of extradition was concluded between the two nations in 1868, 15 Stat. 629. Valid amendments were made to the treaty in 1869 and 1885, 16 Stat. 767 and 24 Stat. 1001. Murder was one of the crimes made extraditable by the treaty.

On December 11, 1941, 55 Stat. 797, the Congress of the United States declared that a state of war existed between the United States and Italy. At the conclusion of the war a treaty of peace was concluded, effective September 15, 1947. 61 Stat. 1245. This peace treaty, which was duly ratified by the United States Senate, provided in Article 44 as follows:

"1. Each Allied or Associated Power will notify Italy, within a period of six months from the coming into force of the present Treaty, which of its pre-war bilateral treaties with Italy it desires to keep in force or revive. Any provisions not in conformity with the present Treaty shall, however, be deleted from the above-mentioned treaties.

"2. All such treaties so notified shall be registered with the Secretariat of the United Nations in accordance with Article 102 of the Charter of the United Nations.

"3. All such treaties not so notified shall be regarded as abrogated." 61 Stat. 1386.

On February 6, 1948, the Secretary of State of the United States notified the Republic of Italy that the United States desired to keep in force or revive, among others, the Extradition Treaty of 1868, as amended.

It is the appellant's position that under established principles of international law the outbreak of war between Italy and the United States in 1941 operated to abrogate completely the extradition treaty previously existing between the two nations. That being so, the appellant argues that in order to revive the extradition treaty it was necessary to make a new treaty, and that a new treaty under the Constitution of the United States could have been made only by the President, with the explicit concurrence of the Senate by a two-thirds vote. U.S.Const. Article II, Section 2. The appellees concede in their brief, as they obviously must, "that it would * * * require the concurring action of the President and the Senate to re-enact a treaty once dead as distinguished from one which is dormant or held in abeyance. * * *"

Whether the war between Italy and the United States completely annulled the previous extradition treaty is thus the central question before us. If the war did have that effect, the appellant is correct in his position that there is now no treaty of extradition between the two nations, since it is conceded that the "notification" of February 6, 1948, was not submitted to the United States Senate for its advice and consent.

Early publicists adopted the view that war *ipso facto* abrogates all treaties between the belligerent nations.[3] In more

3. See Lenoir, "The Effect of War on Bilateral Treaties, with Special Reference to Reciprocal Inheritance Treaty Provisions," 34 Georgetown L.R. 129 (1946), where citations to the views of the earlier writers upon this question are collected in footnote 9. The reasoning in support of this view is expressed in 3 Vattel, The

recent times, however, this theory has been rejected by the textwriters in international law,[4] and it seems never to have been espoused by courts in the United States.

The question was first considered by the Supreme Court in Society for Propagation of the Gospel in Foreign Parts v. New Haven, 1823, 8 Wheat. 464, 5 L.Ed. 662. Although *dicta*, the views the Court there expressed have never since been questioned:

> "But we are not inclined to admit the doctrine urged at the bar, that treaties become extinguished, *ipso facto*, by war between the two governments, unless they should be revived by an express or implied renewal on the return of peace. Whatever may be the latitude of doctrine laid down by elementary writers on the law of nations, dealing in general terms, in relation to this subject, we are satisfied, that the doctrine contended for is not universally true. There may be treaties of such a nature, as to their object and import, as that war will put an end to them; but where treaties contemplate a permanent arrangement of territorial, and other national rights, or which, in their terms, are meant to provide for the event of an intervening war, it would be against every principle of just interpretation, to hold them extinguished by the event of war. * * * We think, therefore, that treaties stipulating for permanent rights, and general arrangements, and professing to aim at perpetuity, and to deal with the case of war as well as of peace, do not cease on the occurrence of war, but are, at most, only suspended while it lasts; and unless they are waived by the parties, or new and repugnant stipulations are made, they revive in their operation at the return of peace." Society for Propagation of the Gospel in Foreign Parts v. New Haven, 1823, 8 Wheaton 464, at page 494, 5 L.Ed. 662.

This statement was cited as basic law in the United States as recently as 1947 in Clark v. Allen, 1947, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633, where it was said, "We start from the premise that the outbreak of war does not necessarily suspend or abrogate treaty provisions." 331 U.S. at page 508, 67 S.Ct. at page 1435.

▪ While it is therefore settled, at least in this country, that all treaties are not automatically abrogated by the outbreak of war between the parties, it is not easy to postulate an applicable standard to determine whether a particular treaty has survived a war. The difficulty was stated more definitively than was the solution in Karnuth v. United States, 1929, 279 U.S. 231, at page 236, 49 S.Ct. 274, at page 276, 73 L.Ed. 677:

> "The effect of war upon treaties is a subject in respect of which there are widely divergent opinions. The doctrine sometimes asserted, especially by the older writers, that war *ipso facto* annuls treaties of every kind between the warring nations, is repudiated by the great weight of modern authority; and the view now commonly accepted is that 'whether the stipulations of a treaty are annulled by war depends upon their intrinsic character.' [5]

---

Law of Nations, Section 175 (trans. of ed. 1758, Fenwick, 1916), which is there quoted: "Conventions and treaties are broken and annulled when war breaks out between the transacting parties, either because such agreements imply a state of peace, or because each party, having the right to deprive the enemy of his property, may take from him such rights as have been given him by treaties."

**4.** "[T]he farther back we go, the more sweeping and undiscriminating are the assertions that all treaties are abrogated by the outbreak of war between the contracting parties, and the passage of time brings with it the realization that there are many exceptions to this statement." McNair, The Law of Treaties, page 532 (1938).

Moore's Digest of International Law, § 779, p. 383. But as to precisely what treaties fall and what survive, under this designation, there is lack of accord. The authorities, as well as the practice of nations, present a great contrariety of views. The law of the subject is still in the making, and, in attempting to formulate principles at all approaching generality, courts must proceed with a good deal of caution. But there seems to be fairly common agreement that at least the following treaty obligations remain in force: Stipulations in respect of what shall be done in a state of war; treaties of cession, boundary, and the like; provisions giving the right to citizens or subjects of one of the high contracting powers to continue to hold and transmit land in the territory of the other; and, generally, provisions which represent completed acts. On the other hand, treaties of amity, of alliance, and the like, having a political character, the object of which 'is to promote relations of harmony between nation and nation,' are generally regarded as belonging to the class of treaty stipulations that are absolutely annulled by war. Id., p. 385, quoting Calvo, Droit Int. (4th Ed.) IV. 65, § 1931."

Counsel have cited us to no decision, and we have found none, specifically relating to the effect of war upon a treaty of extradition. Such a treaty does not conveniently fit into either of the alternative classifications set out in the Karnuth opinion quoted above. If the question were to be decided in a vacuum, the conclusion could only be that it is extremely doubtful that war *ipso facto* abrogates a treaty of extradition. Fortunately, however, the question need not be so decided, but can and must be decided against the background of the actual conduct of the two nations involved, acting through the political branches of their governments.

In Terlinden v. Ames, 1902, 184 U.S. 270, 22 S.Ct. 484, 489, 46 L.Ed. 534, where the question for decision was whether an extradition treaty between the United States and the Kingdom of Prussia had survived the absorption of Prussia into the German Empire, it was contended that this treaty "had been terminated by operation of law" as the result of the formation of the German Empire. In deciding that the treaty had survived, the Court relied heavily upon the intention of the parties as revealed by the conduct of their executive departments. " * * * [W]e think that on the question whether this treaty has ever been terminated, governmental action in respect to it must be regarded as of controlling importance." 184 U. S. at page 285, 22 S.Ct. at page 490. " * * * [I]t cannot be successfully contended that the courts could properly intervene on the ground that the treaty under which both governments had proceeded, had terminated by reason of the adoption of the Constitution of the German Empire, notwithstanding the judgment of both governments to the contrary." 184 U.S. at pages 289–290, 22 S.Ct. at page 492.

█ The consummation of the treaty of peace with Italy in 1947 containing Article 44 providing for "notification" by the United States of each pre-war bilateral treaty it desired to keep in force or revive, the ratification of that treaty by the United States Senate, the subsequent notification by our State Department with regard to the extradition treaty, and the conduct of the political departments of the two nations in the ensuing nine years, evidencing their unqualified understanding that the extradition treaty is in full force and effect, all make it obvious that the political departments of the two governments considered the extradition treaty not abrogated but merely suspended during hostilities. There is, to be sure, a certain circuity of reasoning in deciding that the parties did not need to make a new treaty of extradition for the reason that

they did not in fact make one. Yet it is exactly that pragmatic and cautious approach that, if the question is doubtful, the authorities enjoin. Terlinden v. Ames, 184 U.S. 270, 22 S.Ct. 484, supra. "A construction of a treaty by the political department of the Government, while not conclusive upon a court called upon to construe such a treaty in a matter involving personal rights, is nevertheless of much weight." Charlton v. Kelly, 1913, 229 U.S. 447, at page 468, 33 S.Ct. 945, at page 952, 57 L.Ed. 1274. See Judge Mack's scholarly opinion in The Sophie Rickmers, D.C.S.D.N.Y.1930, 45 F.2d 413, and Judge Cardozo's eloquent discussion in Techt v. Hughes, 1920, 229 N.Y. 222, 128 N.E. 185, 11 A.L.R. 166.

■ It is our conclusion that the treaty of extradition between the United States and Italy was not terminated but merely suspended during the war, and that it is now in effect.

We turn briefly to the claim that the Commissioner improperly admitted evidence identifying the appellant as the Tommaso Argento who had been charged in Italy with murder.[5] This evidence consisted of the sworn statements of three individuals in Italy identifying two photographs, and of records relating to the appellant which had been filed under the now repealed Alien Registration Act of 1940, 54 Stat. 670; compare 8 U.S.C.A. § 1302, and which were produced at the hearing by an employee of the Naturalization and Immigration Service of the United States Department of Justice.

The sworn statements were taken *ex parte* in Italy without the knowledge of the appellant or his counsel. They were obviously hearsay, and clearly would have been inadmissible in a criminal trial in the United States. But that is not the test. The only question to be answered under the statute is whether the statements were "properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals," of Italy. 18 U.S.C.A. § 3190. Bingham v. Bradley, U. S. Marshal, 1916, 241 U.S. 511, 517, 36 S.Ct. 634, 60 L.Ed. 1136. It was the unambiguous testimony of an expert in Italian law that they were.

■ Although this evidence was properly admitted, however, its sufficiency to identify the appellant would be extremely doubtful without the additional evidence contained in the records filed under the Alien Registration Act. The appellant contends that those records, and copies made from them, were improperly admitted, because Congress has expressly made them confidential, to be released only by the Attorney General.[6] The appellant correctly points out that there was no showing before the Commissioner that the Attorney General had consented to the production of the records in question.

■ It is unnecessary to consider whether rejection of the records would have been the appropriate sanction to apply if there had been an affirmative showing that the Attorney General had not consented to their production. We are of the view that the appellant's contention cannot prevail for the reason that, since there was no such showing, it must be presumed that the Attorney General did consent. United States v. Chemical Foundation, 1926, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131.

The appellant has apparently been a law-abiding person during the thirty years that he has been in this country. To enter a judgment that will result in sending him back to life imprisonment

---

5. The entire authenticated record of the trial proceedings in Italy was before the Commissioner, and the appellant apparently does not question the sufficiency of that evidence to sustain the charge that *a* Tommaso Argento had been convicted *in absentia* of committing a murder in Italy.

6. "All registration and fingerprint records made under the provisions of this subchapter shall be confidential, and shall be made available only to such persons or agencies as may be designated by the Attorney General." 8 U.S.C.A. § 1304 (b).

264

in Italy, upon the basis of the record before the Commissioner, does not sit easily with the members of a United States court, sensible of the great Constitutional immunities. For the reasons expressed in this opinion, however, we conceive it our obligation to do so. As correctly stated by District Judge Connell, "The guaranties [the appellant] seeks in this country have no relation to offenses which have been committed within the jurisdiction of the demanding country." Neely v. Henkel, 1901, 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448.

The judgment of the district court is affirmed.