## CONTROL OF EDUCATIONAL INSTITUTIONS MAINTAINED BY ENDOWMENT AND TAXATION.

Circuit Court of Lucas County.

CITY OF TOLEDO v. CHARLES A. SEIDERS ET AL.*

Decided, March 19, 1910.

*Constitutional Law—Schools—Limitations on the Power of Boards of Education Under Section 7921—Constitutional and Vested Rights—Obligation of Contracts.*

The provision of Section 7921, General Code, that the administration of all estates or funds transferred to any municipality for educational purposes shall be committed to the board of education, is unconstitutional in the taking of property without due process of law and the impairment of contract obligations in so far as it changes the plans and purpose of the terms of the original trust created by donors and accepted by the municipal council of the city of Toledo.

*Cornell Schreiber,* City Solicitor, and *B. A. Hayes,* for plaintiff.

*Floyd T. Williams* and *C. A. Seiders,* contra.

WILDMAN, J.; PARKER, J., concurs in a separate opinion; KINKADE, J., dissents in a separate opinion.

This is an action instituted in the court of common pleas and appealed to this court to restrain the board of education of the school district which includes the city from interfering with the possession of certain property, known as the Manual Training School, on land owned by the board of education and heretofore leased by it to the Toledo University. There are certain other minor issues involved which I will not stop to recite.

The case involves a more extended and elaborate discussion than almost any other case recently presented to us, and it would be interesting perhaps to review again to some extent the history of the trust originally given by Jessup W. Scott and others, for

---

* Affirmed without opinion, *Seiders et al v. City of Toledo,* 83 Ohio State, 495.

the endowment of what in its inception was called a University of Arts and Trades. The attempted acts of the board of education are based mainly now upon Section 7921, General Code, which provides as follows:

"The custody, management and administration of any and all estates or funds given or transferred in trust to any municipality for the promotion of education and accepted by the council thereof, and any institution for the promotion of education heretofore or hereafter so founded, other than a university as defined by this act, shall be committed to and exercised by the board of education of the school district including such municipality, and such board of education shall be held the representative and trustee of such municipality in the management and control of such estates and funds so held in trust and in the administration of such institutions excepting always funds and estates held by any municipality which are used to maintain a university as heretofore defined."

In Section 7905, General Code, we find:

"A university supported in whole or in part by municipal taxation is defined as an assemblage of colleges united under one organization or management affording instruction in the arts, sciences and the learned professions and conferring degrees."

The contention of counsel for the board of education is substantially that the institution now known as the Toledo University, the trustees of which, heretofore appointed by the mayor of the city are asserting a right to the control of the property involved in the trust, is excluded from this definition; that it is not an assemblage of colleges, such as Section 7905 describes, and consequently that the administration of the trust is committed by Section 7921 to the board of education. The principal contention upon the other side is that the Legislature had no power to take away from the municipality or the trustees appointed by the mayor of the municipality the control of this trust; in other words, that if Section 7921 is to be construed as claimed by counsel for the board of education, it is unconstitutional and invalid.

Questions involving the trust, to which reference has been made, have been in litigation for many years, and have several

times been brought to the attention of our court. There is one case, that of *The State, ex rel. Waldron,* v. *City of Toledo,* 5 C.C.(N.S.), 227; 16 C. D., 628, in which the question of the power of the Legislature to take the control and management of these funds and this property from the trustees of the Toledo University and pass them over to the board of education was considered and passed upon. But it is earnestly urged upon us by counsel for the board of education that the conclusions arrived at by the court in that case ought not to stand; that they were based upon some confusion in the minds of the members of the court as then constituted as to the relations of the original incorporated Toledo ''University of Arts and Trades'' to the ''Toledo University,'' so named—some confusion perhaps as to any line of demarcation between the two. The syllabus of the case perhaps sufficiently expresses the judgment of the court as then held. The case which presented the question of the constitutionality of Section 7921, General Code, was decided October 10, 1904. The syllabus is as follows:

''The Legislature is without authority to take the entire control and management of the Toledo University and its property from the trustees appointed by the mayor and pass it over to the city board of education.''

This case is conclusive of the main question in contention now before us, unless we depart from the view then arrived at. To my mind there is some confusion in a part of the phraseology used by Judge Haynes in the opinion as we find it reported, but when we read all the cases in which these various matters pertaining to this trust have been litigated in this court, it is hardly conceivable that its members have not been at all times fully apprised of the history of this benefaction. They have had knowledge of the terms of the original grant, of the communications made to the city council by the persons interested in the corporation known as the Toledo University of Arts and Trades; of the resolutions of council; of the appointment of the trustees by a mayor of the city of Toledo to take over the property; of the conveyance to the city and transfer of the powers and functions to the trustees of the Toledo University as agents of the

municipality to carry out the purposes of the original donors; and finally they were apprised of this statute, the construction and validity of which are now under consideration.

In the conclusion at which we have arrived, perhaps we are not disposed to place precisely the same reliance as an authoritative adjudication of the whole matter upon the case of *State* v.. *Neff*, 52 O. S., 375, as was placed upon it in the opinion of Judge Haynes; but the circuit court in the Waldron case was not oblivious of the general current of authority in the United States touching benefactions of this kind, involving trusts for the endowment of institutions of learning of one character or another, the Girard will case, the Dartmouth College case, and numerous other adjudications involving principles analogous to those considered and announced in these two great leading cases by the Supreme Court of the United States.

This case is one of much importance, and for that reason has drawn out from counsel the unusual research and ability of argument which invite a wider range of discussion on my part than perhaps it is wise to give to it. It is hardly worth while to review the history of the transactions. Reference may be made to that history so far as it is recounted in the earlier cases brought into this court and found reported, and I will merely cite them so that they may be read if necessary: *State, ex rel Atty.-General* v. *Toledo*, 3 C.C.(N.S.), 468; 13 Cir. Dec., 327 (to which I may make a little further reference later); *James Waddick, a Tax-payer*, v. *Merrill et al*, 5 C.C.(N.S.), 103; 16 C. D., 437; and the case already cited, *State, ex rel Waldron*, v. *Toledo*, 5 C.C.(N.S.), 277; 16 C. D., 628.

We are not inclined to think that in the consideration of these issues, too much reliance should be placed upon the character and scope, either of the present Manual Training School as it has been constituted and conducted, or on the other hand upon the scope and character of what is known as the Toledo University as now organized, managed and conducted in the city of Toledo. To some extent these matters are interesting for such light as they may throw upon the intention of the original donors; but the ultimate execution of that intent is not to be prevented or interfered with by legislative enactment or judicial

decree, simply because it has not yet been fully carried out. It is contended, however, by counsel for the board of education that when the original donation was made by Jessup W. Scott and others, they had in contemplation only an institution such as that now known as the Manual Training School, such a one as has been conducted by the board of education in the city of Toledo. We feel quite clear from an examination of the original instruments expressive of the purposes of the donors, from the term used and from the various circumstances in the case, that Jessup W. Scott and the others uniting with him had in contemplation something of a different character and wider scope than now comprised within the Manual Training School, as we call it. I will not take time to read all the original instrument, the first instrument, drawn in 1872, in which these donors expressed their will—in which they carefully stated what it was that they were trying to found. In its general title it was to be a university of "arts and trades" but there were certain provisions in it indicative of the intent to found an institution for the education of men in various employments and arts. As I have it before me, I will read a part of it emphasing certain phraseology especially pertinent to our inquiry:

"The object of this trust is to establish an institution for the promotion of knowledge in the arts and trades *and their related sciences* by means of lectures and schools, *by extensive collections of models and representative works of art;* by geological and mineralogical or other cabinets and museums that relate to the mechanic arts, and *whatever else will serve to furnish artists and artisans* with the best facilities for a *high culture* in their *profession;* also to furnish instruction in the use of phonographic characters and to aid their introduction into more general use. *Other branches of learning* not included in the above specifications may become a part of the institution when endowed so as to be sustained without the use of the trust funds hereinafter provided. All the advantages offered by this institution are to be *free of cost to all pupils who have not the means to pay for the same, and all others are to pay* such tuition and other fees as the trustees may require. The institution shall be open to pupils of both sexes alike."

It would seem that a wide scope in the advancement of learning by instruction in this institution was contemplated, and that

its purpose was to afford free instruction to all persons of whatever age who were without the means to pay for their tuition, is expressed in terms. In the manual training schools conducted by boards of education in the state of Ohio under the law, no adults can, under our statutes, obtain free tuition. In a somewhat elaborate and long communication addressed to the city council by some of the original incorporators of the University of Arts and Trades, including among them one or more of the original donors, the idea is expressed that such a university would be of inestimable value to the city of Toledo in the same way in which various universities mentioned in the communication have been of advantage to cities of Europe and the United States where they have been conducted; universities which give instruction to adults, and indeed the word "adults" is used in more than one place in this communication. It is possible that the scope of the manual training school, also may not be bounded by the growth which it has already attained. It may, indeed, while sustained in part by this trust fund, not be bound by the limitations of the statutes as to the pupils who may obtain its benefits, because it is possible that under Section 7921 attempting to transfer the control to the board of education, it is not contemplated by the Legislature that there shall be any limitation upon the power of the board of education to carry out all the purposes of the original trust; in other words, a very liberal construction of Section 7921 would empower the board of education to establish such a University of Arts and Trades as was contemplated by the original donors, even to the extent of giving instruction in the arts of painting and sculpture and all other branches of learning, and affording it without cost to indigent pupils of whatever age. It is possible that the Legislature intended that the board of education should be made the trustees of the original benefaction and be empowered to carry out all the purposes of the original trust without any impairment thereof, even to the establishing of a university outside of the bounds of the school district represented by them. But there is nothing in the statute clearly indicating an intention of the Legislature that any board of education may carry on such a university. That it was the intention of the original donors that a university

might some day be established upon the tract of 160 acres of land adjacent to the city of Toledo, and which seems to have been platted with some such purpose in view as shown by the record before us, we think is indicated. It may be fairly drawn from the facts disclosed in the record that the donors were not limiting the establishment of their university to the corporate bounds of the city of Toledo. Indeed, there is no statement in the original grant that the university shall be anywhere within Lucas county, and unless that idea is to be inferred from the name of the university and from the arguments held out to the municipality by the persons who signed the communication to which I have referred, we have no authority for assuming that the university was to be limited in its establishment to the city of Toledo.

Now in consideration of Section 7921, and without further touching upon the question of the legislative power to change the control of the trust, it may be suggested that unless the board of education is given power by this section to establish such a university of arts and trades as was in the minds of the original donors, the effect of the legislation if carried out, would be to prohibit forever the consummation of the purposes of the original donors except in so far as they can be carried out within the limits of our statutes as to common schools. In other words, it never could be made a university as defined by the other section of the statute, 7905. It never could become an assemblage of colleges for the purpose stated in that definition, because that class of universities is expressly excepted from the operation of the section which confers the control upon the board of education. They are not to have any control of a university as defined by the act, and if the University of Arts and Trades is one which when it reached its perfect development as contemplated by the donors, would fairly come within that definition, then the statute either does not transfer the control of it to the board of education, or defeats the purpose of the trust.

No force is to be attached to the fact that in the summer following the passage of this act as amended to its present form the Toledo University began to enlarge its apparent scope by taking in a school of dentistry and other institutions, because the trustees could not after the enactment had been effected change the

character of their university so as to bring it within the terms of the act. But the question may well be considered whether the Legislature, in excepting universities, should not be held to consider those which are inchoate, those which have been partly formed and which are already carrying out some of their purposes with the intention of carrying out all, as well as to except those which had become perfected universities within the definition of the law. Otherwise, as I have said, we must construe this section as preventing the perfecting of an organization and establishment and conduct of a university which has already been started for the purpose of giving instructions in many other and higher branches of learning than those ordinarily considered in the Manual Training School.

The authorities both of text writers and judicial adjudication are not uncommon touching questions of this character. I will not lengthen this opinion by reading from them. We have had many cited, and we have found a number which were not mentioned in the briefs or oral arguments of counsel. I will cite certain authorities without further comment than the mere reference: Cooley, Const. Lim. (6th ed.), pages 289, 290, 291; *Yarmouth* v. *North Yarmouth*, 34 Me., 411; *Gloucester School Fund* v. *Bradbury*, 11 Me., 118; *Dartmouth College* v. *Woodward*, 17 U. S. (4 Wheat.), 518; *State* v. *Neff*, 52 Ohio St., 375; *South Kenton Union Sunday Sch.* v. *Espy*, 17 C. C., 524; *Koblitz* v. *University*, 21 C. C., 144; *Society, etc.,* v. *New Haven*, 21 U. S. (8 Wheat.), 464; *Allen* v. *McKeen*, 1 Sumner, 276; *Montpelier Academy* v. *George*, 14 La., 395; *University of Maryland* v. *Williams*, 9 Gill & J. (Md.), 365.

I will not take further time in discussion of the conclusion at which we have arrived, that we ought not to depart from the principle which was enunciated by our court in the Waldron case. Some doubt has remained with a part of this court as to the power of the original recipients of the grant, the trustees of the University of Arts and Trades, to delegate that trust to the municipality; but the attorneys upon both sides of the present controversy have conceded the legal title to be in the city and the control in the trustees of the Toledo University as agents of the city unless it is taken from them by this legislative enactment, General Code, 7921, so that we have not seen fit

to consider particularly that phase of the question. There has been such a recognition in these previous adjudications in our court of the title as having passed to the municipality and as to the validity of the appointment of the trustees of the Toledo University by the mayor, that it is perhaps no longer an open question. Our judgment is that the contentions made by the plaintiff should be sustained and the relief asked in the petition will be granted.

PARKER, J.

As has been remarked by Judge Wildman, the principal question in this case, as we regard it, and the question upon which the rights of the parties hinge, was involved and passed upon in the case of *State* v. *Toledo*, 5 C.C.(N.S.), 277; 26 O. C. C., 628. I was a member of the court when that case was decided, and I know it received very careful consideration at the hands of the court, and all members of the court concurred in the decision. In the opinion there are certain expressions that sound like slips of the tongue, upon the part of Judge Haynes, who delivered the opinion, in uttering the names of the institutions named in the deed of donation, the articles of incorporation and the statutes. I presume that the opinion was never submitted to him for correction or those little discrepancies might have been eliminated. I concurred in that decision and I still believe it was correct, and therefore I concur in the judgment that has been announced.

In considering the question (which I do not deem a controlling question here), whether the Manual Training School now authorized by statute, fulfills all the desires and purposes of the donors, it must be borne in mind that it is made clear by the record that their intent and purpose was to furnish instruction "supplementary" to that afforded by the public schools.

I do not look upon this case as involving simply a question of whether the Legislature may choose other instruments than the so-called board of directors of the Toledo University to represent the city in the administration of this trust. I do not question the authority of the Legislature in the matter of designating and changing the instruments to work out the will of

the city in its capacity of trustee, but I regard this statute as going far beyond that; I regard it as a statute which deprives the city of the administration of this trust, totally and completely, and deprives it of any vested interest it may have by virtue of the conveyance made to it, and also its further interest by reason of the investment in the property involved of funds of the city raised by municipal taxation. I believe that under the authorities, in its right of holding and administering trust property of this description and those recognizing and favoring its proprietary rights, the city has certain vested rights and interests which it is incompetent for the Legislature to take away from it, without proper compensation and due process of law, as is here attempted. Also that the effect of this statute is to impair the obligation of a contract entered into between the city and the trustees of the Toledo University of Arts and Trades, in consideration of which contract the conveyance of the property was made to the city, and upon which conveyance the city undertook, promised and agreed to administer this trust, a thing that it had the right and the power to do under and by virtue of the statutes then in force.

If by a sweeping statute of this description the city is deprived of this property and is prevented altogether from taking any part in, or doing anything about, the administration of the trust, that amounts in my opinion not only to depriving it of vested rights without due process of law in contravention of the Constitution, but it amounts to impairing the obligation of the contract entered into between the original directors and the city, to which I have referred, which would also be in contravention of constitutional rights.

Much has been said here about the inability of the Toledo University through its board of trustees to administer this trust in such a way as to accomplish fairly and reasonably the purposes intended by the donors. It is enough to say that that question is not involved in this case. This case as it is presented to us presents a question of proprietary rights; it is a question of whether or not these lessees of this property have become now in effect, by force of this legislation, not only lessees but lessors, and practically owners and controllers of the property, so that they are not bound longer to regard the terms of

the lease under which they entered into possession of the property and under which the school building was built and equipped and hitherto has been operated. Whether the directors of the Toledo University are exercising powers and functions that they have no right to exercise under this statute in the matter of gathering in various schools and colleges about the city and treating this bringing of the colleges together as the establishment of a university coming within the purview of General Code 7905, or whether they are unable to carry out the project of the donors by reason of lack of funds, or whether indeed they contemplate any act that would amount to misadministration or maladministration of the funds, is, in our opinion, not at all involved in the controversy presented to us. Should the university directors or the city undertake to do any of those things, there is a way by legal process to reach them and control them. In my judgment this statute, while it contains some language giving color to the idea that the board of education is simply a representative of the city in administering this trust—simply an agency of the city—is, to the extent that it gives that color, a deception and a snare. It does more. You can not take away from a person or a corporation all of the control, all of the usufruct of property, without in effect taking from him or it the property. If this statute is to be given effect, the matter is so completely turned over to the board of. education as that the city can not have a word to say in the future as to the management of this trust or these trust funds; not a word. It has started in to establish the Toledo University, so-called, and has undertaken to, and has in fact, put in operation what it calls one branch thereof, which branch has developed into what we are in the habit of calling the Manual Training School. But it has never declared its purpose to not, when able, establish and operate other branches; it has never, in other words, declared that the institution shall never grow beyond this single branch; that that shall be the end of its growth and development. But if this statute is given effect, then I take it that so far as the administration of this trust is concerned, no matter how valuable the property may become, no matter how much it may be added to by other donations, no matter how able the city may become in the admin-

istering of this trust to enlarge the so-called university, and extend it, the city is by this statute rendered utterly helpless. If it should attempt to establish another branch of the university, the board of education might ignore such action, and indeed would have no authority to give any effect or to pay any attention to its action in the premises. Therefore it is that I regard this statute, when you get at the clear meaning of it, as being a statute which does not provide for another agency to administer this trust on behalf of the city of Toledo, but as a statute which transfers the whole trust and the whole property to the board of education, another public corporation, representing another and a different constituency, leaving the city of Toledo utterly helpless in the matter, and with nothing but the bare, naked, legal title in it. And considering it in that way, as a statute which practically takes the property away from the city and gives it to another corporation, it seems to me that it may just as well have given it to the board of education of the city of Perrysburg or to Lucas county or to any other public corporate body. Regarding it in that way, it seems to me, as I have said, to impair the obligation of this contract with the representations of the donors and to deprive the city, without justification or due process of law, of vested rights. In my remarks, following the opinion by Judge Haynes, in the Waldron case, I attempted to point out how and why the school district almost (but not quite), coterminous with the city limits, is an essentially different entity from the city, so much so that it can not ever be said that the same electors are concerned or given ultimate control.

KINKADE, J. (dissenting).

I find myself entirely unable to agree with my associates in the conclusions reached in this case. It would be idle, in the time at hand, to attempt to make a statement of this case. I think the statement of the case by counsel, together with the reading of the agreed statement of facts, occupied between an hour and a half and two hours, and occupied no more time than it should have occupied; and the opinion expressed by the majority of the court has occupied over an hour. So that

it will be apparent that if I made any attempt to state this case in detail there would be considerable said on the subject. If this court had many cases that had the facts and the history this case has, it would not need any other litigation brought in to keep it continually busy, and very busy.

This case has had a very great deal of attention from this court. I will content myself with simply stating briefly a few things. First, in my judgment, the donor, Mr. Scott, had no such notion in mind in using the term "University of Arts and Trades," as the university that it is now contended exists in the city of Toledo. Second, I think the university as it is now contended, exists in the city of Toledo and in no wise meets the requirements of the definition of a university, as laid down in the statute. I have no trouble at all in reaching the conclusion that the Legislature had full and ample power to do all that it attempted to do in General Code 7915 and 7905, and it does not seem to me that they have disturbed any vested rights or have gone beyond the point that they might rightfully go. I have no difficulty in concluding in this case that this property is and should be, all of it, clearly within the control of the board of education of the city of Toledo, and I do not see that the city is denied the right to have anything to say about what should be done with this property in the future, when the board of education consists of members elected by the citizens of the city of Toledo, who may be changed at any time.

I wish I had time to review this case. It would not en- lighten counsel any. I will sum the whole matter up by saying this: I think the position taken in this case and the authorities cited to support the position by the counsel for the board of education and the counsel representing the Scott heirs, has not at all been met by the other side, and I agree entirely with the position taken by counsel representing the board of educa- tion and the Scott heirs in this case, and so thinking, of course, I can not agree with the conclusion reached by the majority of the court.