THE PEOPLE, *ex rel.* the Attorney General, Respondents, *v.* HENRY GERKE and HIRAM C. CLARK, Appellants.

Treaties made by the United States removing the disability of aliens to inherit, are valid, and within the intent of the Constitution of the United States.

APPEAL from the District Court of the Fourth Judicial District, San Francisco County.

On the 23d day of August, 1853, one Auguste Deck, a citizen of Prussia, died intestate, in the city of San Francisco, leaving, undisposed of, a large amount of real estate.

On the 14th of September following, letters of administration were granted by the Probate Court to the defendant, Gerke.

Clark afterwards purchased from the absent heirs a large portion of the property.

An information was filed by the Attorney General in the Court below, citing the defendants to show cause why Deck's estate should not escheat to the State of California. The Court below entered judgment, *pro forma*, in favor of the People. Defendants appealed.

*Foote & Aldrich*, and *Jo. G. Baldwin*, for Appellants.

The 14th Article of the Convention entered into between the United States and Prussia, in the year 1828, provides, that, " When on the death of any person holding real estate within the territory of the one party, such real estate would, by the laws of the land, descend on a citizen or subject of the other, were he not disqualified by alienage, such citizen or subject shall be allowed a reasonable time to sell the same, and to withdraw the proceeds without molestation."

This treaty clearly gave Deck's heirs the power to dispose of the estate. The treaty is valid, and is capable of being maintained in the face of any State legislative enactment. 2 Story's Com. on Const., p. 315, § 1508. Chirac *v.* Chirac, 2 Wheat., 259. Orr *v.* Hodgson, 4 Ibid., 453. The Society for the Propagation of the Gospel *v.* The Town of New Haven, 8 Ibid., 464. Hughes *v.* Edwards, 9 Ibid., 489.

Banks *v.* Carneal, 10 Ibid., 181.　Henks *v.* Dupont, 3 Peters, 242. Ware *v.* Hilton, 3 Dallas, 236.

*J. R. McConnell*, Attorney General, for the People.
No brief on file.

HEYDENFELDT, J., delivered the opinion of the Court.　BRYAN, J., concurred.

By a convention between the United States and the Kingdom of Prussia, made in the year 1828, the 14th article provides, " And when on the death of any person holding real estate within the territory of the one party, such real estate would, by the laws of the land, descend on a citizen or subject of the other, were he not disqualified by alienage, such citizen or subject shall be allowed a reasonable time to sell the same, and to withdraw the proceeds without molestation."

The Attorney General, in support of the information filed in this case, denies the power of the Federal Government to make such a provision by treaty, and the determination of this case depends upon the solution of that question.　Cases have frequently arisen, where aliens have claimed to inherit by virtue of treaty provisions analogous to the one under consideration, and in all of them, so far as I have examined, the stipulations were enforced in favor of the foreign claimants.　See 2 Wheat., 259.　4 Ib., 453.　8 Ib., 464.　9 Ib., 489.　10 Ib., 181.

But in none of these cases was the question raised as to the power of the Federal Government to make the treaty.　It has been the practice of the Government from an early period after the ratification of the Constitution, and its power is now, I believe, for the first time disputed.

The language, which grants the power to make treaties, contains no words of limitation; it does not follow that the power is unlimited.　It must be subject to the general rule, that an instrument is to be construed so as to reconcile and give meaning and effect to all its parts. If it were otherwise, the most important limitation upon the powers of the Federal Government would be ineffectual, and the reserved rights of the States would be subverted.　This principle of construction as applied, not only in reference to the Constitution of the United States, but particularly in the relation of all the rest of it to the treaty-making

grant, was recognized both by Mr. Jefferson and John Adams,—two leaders of opposite schools of construction. See Jefferson's Works, vol. 3, p. 135; and vol. 6, p. 560.

It may, therefore, be assumed that, aside from the limitations and prohibitions of the Constitution upon the powers of the Federal Government, " the power of treaty was given, without restraining it to particular objects, in as plenipotentiary a form as held by any sovereign in any other society." This principle, as broadly as I have deemed proper to lay it down, results from the form and necessities of our Government, as elicited by a general view of the Federal compact. Before the compact, the States had the power of treaty making as potentially as any power on earth—it extended to every subject whatever. By the compact, they expressly granted it to the Federal Government in general terms, and prohibited it to themselves.

The General Government must, therefore, hold it as fully as the States held who granted it, with the exceptions which necessarily flow from a proper construction of the other powers granted, and those prohibited, by the Constitution. The only questions, then, which can arise in the consideration of the validity of a treaty, are : First, Is it a proper subject of treaty according to international law or the usage and practice of civilized nations ? Second, Is it prohibited by any of the limitations in the Constitution ?

Taking for illustration the present subject of treaty, no one will deny that, to the commercial States of the Union, and indeed to the citizens of any State who are engaged in foreign commerce, a stipulation to remove the disability of aliens to hold property, is of paramount importance, or, at any rate, it may be so considered by the States, and demanded as a part of their commercial polity.

Now, as by the compact the States are absolutely prohibited from making treaties, if the General Government has not the power, then we must admit a lameness and incompleteness in our whole system, which renders us inferior to any other enlightened nation, in the power and ability to advance the prosperity of the people we govern.

Mr. Calhoun, in his discourse on the Constitution and Government of the United States, has given to this power a full consideration, and I cannot doubt that the view which I have taken, is sustained by his

reasoning. According to his opinion, the following may be classed as the limitations on the treaty-making power: First, It is limited strictly to questions *inter alios*—" all such clearly appertain to it." Second, " By all the provisions of the Constitution which inhibit certain acts from being done by the Government or any of its departments." Third, " By such provisions of the Constitution as direct certain acts to be done in a particular way, and which prohibit the contrary." Fourth, " It can enter into no stipulation calculated to change the character of the Government, or to do that which can only be done by the Constitution making power; or which is inconsistent with the nature and structure of the Government or the objects for which it was formed."

Having stated these as the only limitations, the author adds, " Within these limits all questions which may arise between us and other powers, be the subject matter what it may, fall within the limits of the treaty-making power, and may be adjusted by it."

One of the arguments at the bar against the extent of this power of treaty, is, that it permits.the Federal Government to control the internal policy of the States, and in the present case, to alter materially the statutes of distribution.

If this was so to the full extent claimed, it might be a sufficient answer to say, that it is one of the results of the compact, and, if the grant be considered too improvident for the safety of the States, the evil can be remedied by the constitution-making power. I think, however, that no such consequence follows as is insisted. The statutes of distribution are not altered or affected. Alienage is the subject of the treaty. Its disability results from political reasons which arose at an early period of the history of civilization, and which the enlightened advancement of modern times, and changes in the political and social condition of nations, have rendered without force or consequence. The disability to succeed to property is alone removed, the character of the person is made politically to undergo a change, and then the statute of distribution is left to its full effect, unaltered and unimpaired in word or sense. If there is one object more than another which belongs to our political relations, and which ought to be the subject of treaty regulations, it is the extension of this comity which is so highly favored

by the liberal spirit of the age, and so conducive in its tendency to the peace and amity of nations.

Even if the effect of this power was to abrogate to some extent the legislation of the States, we have authority for admitting it, if it does not exceed the limitations which we have cited from the work of Mr. Calhoun, and laid down as the rule to which we yield our assent.

During the war of the Revolution, the States had passed Acts of confiscation; Acts against the collection of debts due to the subjects of Great Britain; and Acts for the punishment of treason. By the treaty of peace, the effects of these various Acts were provided against, and as late as 1792, long after the ratification of the Constitution, Mr. Jefferson, in answer to the complaint of the British Minister, Mr. Hammond, distinctly recognized the doctrine, that treaties are the supreme law of the land, and that State legislation must yield to them; and he therein cites the Acts of State Legislatures and the decisions of State Judges, who all conform to the same opinion. See 3 Jefferson's Works, 365.

I can see no danger which can result from yielding to the Federal Government the full extent of powers which it may claim from the plain language, intent, and meaning of the grant under consideration. Upon some subjects, the policy of a State Government, as shown by her legislation, is dependant upon the policy of foreign Governments, and would be readily changed upon the principle of mutual concession. This can only be effected by the action of that branch of the State sovereignty known as the General Government, and when effected, the State policy must give way to that adopted by the governmental agent of her foreign relations.

It results from these views, that the treaty of 1828, with Prussia, is valid, and that aliens, subjects of Prussia, are protected by its provisions.

The judgment is reversed, and the cause remanded.

BRYAN, J. I agree with my associate, that the doctrine has been settled in the United States Courts, in cases relating to analogous treaties to the one in question, that the Courts of the country should

extend to aliens, the full protection which the treaty seeks to give them, in the acquisition or distribution of property.

In Chirac v. Chirac, (2 Wheaton, 259,) the treaty with France of 1778, was passed upon, and it was decided by the United States Court, that it secured to the citizens and subjects of either Power, the privilege of holding lands in the territory of the other. This was reaffirmed in Cavneac v. Banks, (10 Wheaton, 189.) A similar provision in the treaty with Great Britain of 1794 was also sanctioned by the Supreme Court of the United States, in Hughes v. Edwards, (9 Wheaton, 489.) So far as the authority of the Federal Courts is concerned, they appear to have uniformly administed the law upon the meaning given by construction to the language of the treaty, seeming never to have, in any respect, doubted the power of the General Government to provide by treaty with a foreign Power for the mutual protection of the property belonging to the citizens or subjects of each in the territory of the other. The treaty making power of the Federal Government must, from necessity, be sufficiently ample so as to cover all of the usual subjects of treaties between different powers. If we were to deny to the treaty-making power of our Government the exercise of jurisdiction over the property of deceased aliens, upon the ground of interference with the course of descents, or the laws of distribution of a State where property may exist; by parity of reasoning we should not make commercial treaties with foreign nations; because, it might be said, some of their provisions would injure the business of a portion of the citizens of one of the States of the Union.

If the treaty-making power which resides in the Federal Government is not sufficient to permit it to arrange with a foreign nation the distribution of an alien's property, then that power resides nowhere, (since it is denied to the States,) and we must confess our system of government so weak and faulty, as to be incapable of extending to its citizens in foreign lands that protection which is most common amongst a majority of modern civilized nations.

I agree with my associate in the conclusion, that the treaty-making power of the Federal Government was sufficient to enable it to insert the article in the treaty with Prussia, which has before been quoted;

and that the alien heirs of Deck are protected by its provisions, and are entitled to the withdrawal of the proceeds of the estate.

I therefore concur in the reversal of the judgment.

MURRAY, C. J. I neither concur nor dissent from the opinion of the Court, not having heard the argument or examined the questions sufficiently to arrive at any satisfactory conclusion.