CLARK, ATTORNEY GENERAL, AS SUCCESSOR TO THE ALIEN PROPERTY CUSTODIAN, *v.* ALLEN ET AL.

No. 626. Argued April 11, 1947.—Decided June 9, 1947.

---

[1] But cf. Holmes, J., dissenting in *Safe Deposit & Trust Co.* v. *Virginia,* 280 U. S. 83, 96.

*Harry LeRoy Jones* argued the cause for petitioner. With him on the brief were *Acting Solicitor General Washington, Assistant Attorney General Sonnett, M. S. Isenbergh, David Schwartz* and *Armand B. DuBois.*

*S. C. Masterson* argued the cause for respondents. With him on the brief was *Joseph Wahrhaftig.*

By special leave of Court, *Everett W. Mattoon,* Deputy Attorney General, argued the cause for the State of California, as *amicus curiae,* urging affirmance. With him on the brief was *Fred N. Howser,* Attorney General.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Alvina Wagner, a resident of California, died in 1942, leaving real and personal property situate there. By a will dated December 23, 1941, and admitted to probate in a California court in 1942, she bequeathed her entire estate to four relatives who are nationals and residents of Germany. Six heirs-at-law, residents of California, filed a petition for determination of heirship in

the probate proceedings claiming that the German nationals were ineligible as legatees under California law.[1]

There has never been a hearing on that petition. For in 1943 the Alien Property Custodian, to whose functions the Attorney General has recently succeeded,[2] vested in himself all right, title and interest of the German nationals in the estate of this decedent.[3] He thereupon instituted this action in the District Court against the executor under the will and the California heirs-at-law for a determination that they had no interest in the estate and that he was entitled to the entire net estate,

---

[1] Section 259, California Probate Code, in 1942 provided:

"The rights of aliens not residing within the United States or its territories to take either real or personal property or the proceeds thereof in this State by succession or testamentary disposition, upon the same terms and conditions as residents and citizens of the United States is dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take real and personal property and the proceeds thereof upon the same terms and conditions as residents and citizens of the respective countries of which such aliens are inhabitants and citizens and upon the rights of citizens of the United States to receive by payment to them within the United States or its territories money originating from the estates of persons dying within such foreign countries."

Section 259.2 provided:

"If such reciprocal rights are not found to exist and if no heirs other than such aliens are found eligible to take such property, the property shall be disposed of as escheated property."

The condition with respect to receipt of moneys in the United States was repealed in 1945, while this case was pending. Cal. Stats. 1945, c. 1160, § 1, effective September 15, 1945. Under the original act, the non-resident aliens had the burden of establishing the fact of existence of the reciprocal rights. § 259.1. By the 1945 amendment the burden of establishing the non-existence of such reciprocal right was placed on him who challenged the right of the non-resident aliens to take. Section 259.2 was repealed.

[2] Exec. Order No. 9788, Oct. 15, 1946, 11 Fed. Reg. 11981.

[3] Vesting Order No. 762, 8 Fed. Reg. 1252.

after payment of administration and other expenses. The District Court granted judgment for the Custodian on the pleadings. 52 F. Supp. 850. The Circuit Court of Appeals reversed, holding that the District Court was without jurisdiction of the subject matter. 147 F. 2d 136. The case came here on certiorari. We held that the District Court had jurisdiction of the suit and remanded the cause to the Circuit Court of Appeals for consideration of the merits. 326 U. S. 490. The Circuit Court of Appeals thereupon held for respondents. 156 F. 2d 653. The case is here again on a petition for a writ of certiorari which we granted because the issues raised are of national importance.

*First.* Our problem starts with the Treaty of Friendship, Commerce and Consular Rights with Germany, signed December 8, 1923, and proclaimed October 14, 1925. 44 Stat. 2132. It has different provisions governing the testamentary disposition of realty and personalty, which we will treat separately. The one pertaining to realty, contained in Article IV, reads as follows:

> "Where, on the death of any person holding real or other immovable property or interests therein within the territories of one High Contracting Party, such property or interests therein would, by the laws of the country or by a testamentary disposition, descend or pass to a national of the other High Contracting Party, whether resident or non-resident, were he not disqualified by the laws of the country where such property or interests therein is or are situated, such national shall be allowed a term of three years in which to sell the same, this term to be reasonably prolonged if circumstances render it necessary, and withdraw the proceeds thereof, without restraint or interference, and exempt from any succession, probate or administrative duties or charges other than

those which may be imposed in like cases upon the nationals of the country from which such proceeds may be drawn."

The rights secured are in terms a right to sell within a specified time plus a right to withdraw the proceeds and an exemption from discriminatory taxation. It is plain that those rights extend to the German heirs of "any person" holding realty in the United States. And though they are not expressed in terms of ownership or the right to inherit, that is their import and meaning. *Techt* v. *Hughes,* 229 N. Y. 222, 240, 128 N. E. 185, 191; *Ahrens* v. *Ahrens,* 144 Iowa 486, 489, 123 N. W. 164, 166. And see *People* v. *Gerke,* 5 Cal. 381; *Scharpf* v. *Schmidt,* 172 Ill. 255, 50 N. E. 182; *Colson* v. *Carlson,* 116 Kan. 593, 227 P. 360; *Goos* v. *Brocks,* 117 Neb. 750, 223 N. W. 13.

If, therefore, the provisions of the treaty have not been superseded or abrogated, they prevail over any requirements of California law which conflict with them. *Hauenstein* v. *Lynham,* 100 U. S. 483, 488–490.

*Second.* The Circuit Court of Appeals concluded that these provisions of the treaty had been abrogated. It relied for that conclusion on the Trading with the Enemy Act, 40 Stat. 411, 50 U. S. C. App. § 1 *et seq.,* as amended by the First War Powers Act, 55 Stat. 839, 50 U. S. C. App. (Supp. I, 1941) § 5, and the Treaty of Berlin, 42 Stat. 1939.

We start from the premise that the outbreak of war does not necessarily suspend or abrogate treaty provisions. *Society for the Propagation of the Gospel* v. *New Haven,* 8 Wheat. 464, 494–495. There may of course be such an incompatibility between a particular treaty provision and the maintenance of a state of war as to make clear that it should not be enforced. *Karnuth* v. *United States,* 279 U. S. 231. Or the Chief Executive or the Congress may have formulated a national policy quite inconsistent with

the enforcement of a treaty in whole or in part. This was the view stated in *Techt* v. *Hughes, supra,* and we believe it to be the correct one. That case concerned the right of a resident alien enemy to inherit real property in New York. Under New York law, as it then stood, an alien enemy had no such right. The question was whether the right was granted by a reciprocal inheritance provision in a treaty with Austria which was couched in terms practically identical with those we have here. The court found nothing incompatible with national policy in permitting the resident alien enemy to have the right of inheritance granted by the treaty. Cardozo, J., speaking for the court, stated the applicable principles as follows:

"The question is not what states *may* do after war has supervened, and this without breach of their duty as members of the society of nations. The question is what courts are to presume that they have done. . . . President and senate may denounce the treaty, and thus terminate its life. Congress may enact an inconsistent rule, which will control the action of the courts (*Fong Yue Ting* v. *U. S.,* 149 U. S. 698). The treaty of peace itself may set up new relations, and terminate earlier compacts either tacitly or expressly. . . . But until some one of these things is done, until some one of these events occurs, while war is still flagrant, and the will of the political departments of the government unrevealed, the courts, as I view their function, play a humbler and more cautious part. It is not for them to denounce treaties generally, *en bloc*. Their part it is, as one provision or another is involved in some actual controversy before them, to determine whether, alone, or by force of connection with an inseparable scheme, the provision is inconsistent with the policy or safety of the nation in the emergency of war, and hence

presumably intended to be limited to times of peace. The mere fact that other portions of the treaty are suspended or even abrogated is not conclusive. The treaty does not fall in its entirety unless it has the character of an indivisible act." 229 N. Y. pp. 242–243, 128 N. E. p. 192.

To the same effect see *Goos* v. *Brocks, supra; State* v. *Reardon,* 120 Kan. 614, 245 P. 158.[4]

We do not think that the national policy expressed in the Trading with the Enemy Act, as amended, is incompatible with the right of inheritance granted German aliens under Article IV of the treaty. It is true that since the declaration of war on December 11, 1941 (55 Stat. 796), the Act and the Executive Orders issued thereunder have prohibited the entry of German nationals into this country,[5] have outlawed communications or transactions of a commercial character with them,[6] and have precluded the removal of money or property from this country for their use or account.[7] We assume that these provisions abrogate the parts of Article IV of the treaty dealing with the liquidation of the inheritance and the withdrawal of the proceeds, even though the Act provides that the prohibited activities and transactions may be licensed.[8] But the Act and the Executive Orders do not evince such hostility to ownership of property by alien enemies as to imply that its acquisition conflicts with the national policy. There is, indeed, tacit recognition that acquisition of property by inheritance is compatible with the

---

[4] For a recent review of the authorities see Lenoir, The Effect of War on Bilateral Treaties, 34 Geo. L. J. 129.

[5] § 3 (b).

[6] § 3 (a).

[7] § 7 (c); § 5 (b), as amended; Exec. Order No. 8785, 3 C. F. R. Cum. Supp. 948.

[8] § 5 (a).

scheme of the Act. For the custodian is expressly empowered to represent the alien enemy heir in all legal proceedings; including those incident to succession.[9] Much reliance for the contrary view is placed on the power to vest alien property in an agency of the United States.[10] But the power to vest, *i. e.*, to take away, what may be owned or acquired does not reveal a policy at odds with the reciprocal right to inherit granted by Article IV of the treaty. For the power to vest is discretionary not mandatory. The loss of the inheritance by vesting is, therefore, not inevitable. But more important, vesting does not necessarily deprive the alien enemy of all the benefits of his inheritance. If he owes money to American creditors, the property will be applied to the payment of his debts.[11]

To give the power to vest the effect which respondents urge would, indeed, prove too much. That power is not restricted to property of alien enemies. It extends to the property of nationals of any foreign country, friend or enemy.[12] Provisions comparable to that contained in Article IV of the present treaty are found in existing treaties

---

[9] Exec. Order No. 9193, ¶ 5, 3 C. F. R. Cum. Supp. 1174, 1176.

[10] Section 5 (b) (1), as amended, provides in part:

"During the time of war or during any other period of national emergency declared by the President . . . any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President, and upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes . . . ."

[11] 60 Stat. 925, adding § 34 to the Trading with the Enemy Act.

[12] See note 10, *supra*.

with friendly nations.[13]  We will not readily assume that when Congress enacted § 5 (b) and authorized the vesting of property, it had a purpose to abrogate all such treaty clauses.  Cf. *Cook* v. *United States,* 288 U. S. 102, 120. Yet if the power to vest is inconsistent with the right of inheritance of an alien enemy, it is difficult to see why it is any less so when other aliens are involved.  Finally, there is a distinction between the acquisition of property and the use thereof which § 5 (b) itself recognizes.  That section not only grants the President the power to vest; it likewise grants him authority under the same circumstances to "prevent or prohibit, any acquisition . . . of . . . any property in which any foreign country or a national thereof has any interest . . . ." § 5 (b) (1) (B). No action has been taken to prevent or prohibit the acquisition of property by inheritance on the part of enemy aliens.  The grant of express power to cut off, *inter alia,* the right of inheritance and the non-exercise of the power lend support to the view that the Trading with the Enemy Act, as amended, did not without more suspend or abrogate Article IV of the present treaty.  This conclusion squares with the general rule stated in *Karnuth* v. *United States, supra,* p. 237, that treaty provisions "giving the right to citizens or subjects of one of the high contracting powers to continue to hold and transmit land in the territory of the other" survive the outbreak of war.

The argument based on the Treaty of Berlin is inconclusive.  The Joint Resolution of July 2, 1921, 42 Stat. 105, 106, declared that property of German nationals held by the United States should be retained and no disposition made of it, except as specifically provided by law, until the German government made suitable provision for the satisfaction of claims of American nationals against it.

---

[13] Treaty with Great Britain, Arts. I, II, March 2, 1899, 31 Stat. 1939.  Treaty with Norway, Art. IV, June 5, 1928, 47 Stat. 2135, 2138.

Thus absolute title to the property in question became vested in the United States. *Cummings* v. *Deutsche Bank,* 300 U. S. 115. The Treaty of Berlin accorded the United States all rights and advantages specified in the resolution. But the Treaty of 1828 with Prussia contained a provision substantially similar to Article IV of the present treaty. 8 Stat. 378, 384, Art. XIV. Hence it is argued that if the Treaty of 1828 survived the outbreak of war and thus guaranteed property rights in German nationals by way of inheritance during that war, it would not have been necessary to have negotiated a new convention covering the same ground in 1923. And it is also argued that if the provision in the earlier treaty did not survive the war, it is unlikely that the same parties would intend like provisions in the later treaty to have a different effect.

The attitude of the State Department has varied. In 1918 Secretary Lansing expressed the view that such treaty provisions were not in force during the war with Germany and Austria.[14] Today the Department apparently takes the other view.[15] We have no reliable evidence of the intention of the high contracting parties outside the words of the present treaty. The attitude and conduct under earlier treaties, reflecting as they did numerous contingencies and conditions, leave no sure guide to the construction of the present treaty. Where the relevant historical sources and the instrument itself give no plain indication that it is to become inoperative in whole or in part on the outbreak of war, we are left to determine, as *Techt* v. *Hughes, supra,* indicates, whether the provision under which rights are asserted is incompatible with national

[14] U. S. Foreign Rel., 1918 Supp. 2, p. 309 (Dept. State 1933); VI Hackworth, Digest of International Law (1943) p. 327.

[15] Letter to the Attorney General from Acting Secretary of State, Joseph C. Grew, dated May 21, 1945, commenting on the Government's position in the present litigation.

policy in time of war. So far as the right of inheritance of realty under Article IV of the present treaty is concerned, we find no incompatibility with national policy, for reasons already given.

It is argued, however, that the Treaty of 1923 with Germany must be held to have failed to survive the war, since Germany, as a result of its defeat and the occupation by the Allies, has ceased to exist as an independent national or international community. But the question whether a state is in a position to perform its treaty obligations is essentially a political question. *Terlinden* v. *Ames,* 184 U. S. 270, 288. We find no evidence that the political departments have considered the collapse and surrender of Germany as putting an end to such provisions of the treaty as survived the outbreak of the war or the obligation of either party in respect to them. The Allied Control Council has, indeed, assumed control of Germany's foreign affairs and treaty obligations [16]—a policy and course of conduct by the political departments wholly consistent with the maintenance and enforcement, rather than the repudiation, of pre-existing treaties.

*Third.* The problem of the personalty raises distinct questions. Article IV of the treaty contains the following provision pertaining to it:

"Nationals of either High Contracting Party may have full power to dispose of their personal property of every kind within the territories of the other, by testament, donation, or otherwise, and their heirs, legatees and donees, of whatsoever nationality, whether resident or non-resident, shall succeed to such personal property, and may take possession thereof, either by themselves or by others acting for them, and retain or dispose of the same at their pleasure

[16] The Axis in Defeat, State Dept. Pub. No. 2423, pp. 71, 72, 77.

subject to the payment of such duties or charges only as the nationals of the High Contracting Party within whose territories such property may be or belong shall be liable to pay in like cases."

A practically identical provision of the Treaty of 1844 with Wurttemburg, Art. III, 8 Stat. 588, was before the Court in *Frederickson* v. *Louisiana,* 23 How. 445. In that case the testator was a citizen of the United States, his legatees being citizens and residents of Wurttemberg. Louisiana, where the testator was domiciled, levied a succession tax of 10 per cent on legatees not domiciled in the United States. The Court held that the treaty did not cover the "case of a citizen or subject of the respective countries residing at home, and disposing of property there in favor of a citizen or subject of the other . . . ." pp. 447–448. That decision was made in 1860. In 1917 the Court followed it in cases involving three other treaties. *Petersen* v. *Iowa,* 245 U. S. 170; *Duus* v. *Brown,* 245 U. S. 176; *Skarderud* v. *Tax Commission,* 245 U. S. 633.

The construction adopted by those cases is, to say the least, permissible when the syntax of the sentences dealing with realty and personalty is considered. So far as realty is concerned, the testator includes "any person"; and the property covered is that within the territory of either of the high contracting parties. In case of personality, the provision governs the right of "nationals" of either contracting party to dispose of their property within the territory of the "other" contracting party; and it is "such personal property" that the "heirs, legatees and donees" are entitled to take.

Petitioner, however, presents a detailed account of the history of the clause which was not before the Court in *Frederickson* v. *Louisiana, supra,* and which bears out the construction that it grants the foreign heir the right to succeed to his inheritance or the proceeds thereof. But

we do not stop to review that history. For the consistent judicial construction of the language since 1860 has given it a character which the treaty-making agencies have not seen fit to alter. And that construction is entirely consistent with the plain language of the treaty. We therefore do not deem it appropriate to change that construction at this late date, even though as an original matter the other view might have much to commend it.

We accordingly hold that Article IV of the treaty does not cover personalty located in this country and which an American citizen undertakes to leave to German nationals. We do not know from the present record the nationality of Alvina Wagner. But since the issue arises on the Government's motion for judgment on the pleadings, we proceed on the assumption less favorable to it, viz., that she was an American citizen.

*Fourth.* It is argued, however, that even though the provision of the treaty is inapplicable, the personalty may not be disposed of pursuant to the California statute because that statute is unconstitutional. Issues under the Fourteenth Amendment are not raised as in *Terrace* v. *Thompson,* 263 U. S. 197. The challenge to the statute is that it is an extension of state power into the field of foreign affairs, which is exclusively reserved by the Constitution to the Federal Government. That argument is based on the fact that under the statute the right of nonresident aliens to take by succession or testamentary disposition is dependent upon the existence of a reciprocal right on the part of citizens of the United States to take personalty on the same terms and conditions as residents and citizens of the other nation.[17] The argument is that by this method California seeks to promote the right of American citizens to inherit abroad by offering to aliens

[17] See note 1, *supra.*

reciprocal rights of inheritance in California. Such an offer of reciprocal arrangements is said to be a matter for settlement by the Federal Government on a nation-wide basis.

In *Blythe* v. *Hinckley,* 180 U. S. 333, California had granted aliens an unqualified right to inherit property within its borders. The alien claimant was a citizen of Great Britain with whom the United States had no treaty providing for inheritance by aliens in this country. The argument was that a grant of rights to aliens by a State was, in absence of a treaty, a forbidden entry into foreign affairs. The Court rejected the argument as being an extraordinary one. The objection to the present statute is equally farfetched.

Rights of succession to property are determined by local law. See *Lyeth* v. *Hoey,* 305 U. S. 188, 193; *Irving Trust Co.* v. *Day,* 314 U. S. 556, 562. Those rights may be affected by an overriding federal policy, as where a treaty makes different or conflicting arrangements. *Hauenstein* v. *Lynham, supra.* Then the state policy must give way. Cf. *Hines* v. *Davidowitz,* 312 U. S. 52. But here there is no treaty governing the rights of succession to the personal property. Nor has California entered the forbidden domain of negotiating with a foreign country, *United States* v. *Curtiss-Wright Corp.,* 299 U. S. 304, 316–17, or making a compact with it contrary to the prohibition of Article I, Section 10 of the Constitution. What California has done will have some incidental or indirect effect in foreign countries. But that is true of many state laws which none would claim cross the forbidden line.

In summary, we hold that disposition of the realty is governed by Article IV of the treaty. Disposition of the personalty, however, is not governed by the treaty unless it is determined that Alvina Wagner was a German national. If she was an American citizen, disposition of the

personalty is governed by California law. Whether there are other requirements of the California statute which would bar the California heirs-at-law is a question on which we intimate no opinion.

The judgment is reversed in part and affirmed in part, and the cause is remanded to the District Court for proceedings in conformity with this opinion.

*So ordered.*

MR. JUSTICE RUTLEDGE, concurring in part.

I join in the Court's opinion insofar as it relates to the real estate. But, as to the personal property, I think the cause should be remanded to the District Court for determination of Alvina Wagner's nationality, without expression of opinion here upon the constitutionality of the California statute.

The decision now made on that issue, by virtue of the Court's hypothesizing that she was an American citizen, will be rendered both moot and advisory in character if it is found, as it may well be in the District Court's further proceedings, that she was a German national. This Court has consistently declined to decide constitutional questions on hypothetical presentations. *Rescue Army* v. *Municipal Court,* 331 U. S. 549. The practice should be followed in this case, even though conceivably another appeal might be saved by indulging the presumption which the Court makes. It is more important that constitutional decisions be reserved until the issues calling for them are squarely and inescapably presented, factually as well as legally, than it is to expedite the termination of litigation or the procedural convenience of the parties.