This appeal from an order appointing an administrator turns upon the right of a Chinese national, residing in Canton, China, to inherit from a California decedent.
The decedent, a resident of Los Angeles County, California, but whose nationality is unspecified in the record, died intestate December 5, 1962, leaving both real and personal property. She was a widow and childless. Some of her estate had been the community property of the decedent and her predeceased spouse. She was survived by her mother and her mother-in-law, who would share in the community property under Probate Code, section 228
The brother of decedent's deceased husband filed a petition for letters of administration, alleging that he was an heir at law. The public administrator also petitioned for letters. The two petitions were heard together and evidence was *Page 162 
taken, after which the probate court found that the mother and the mother-in-law of the decedent were the heirs at law, and both were citizens and residents of the Republic of China. The court concluded that the brother-in-law was not entitled to share in the estate, and that the public administrator therefore had priority under Probate Code, section 422, and was entitled to letters of administration.
The brother-in-law has appealed from the order denying his petition and granting the petition of the public administrator.
Appellant contends that under Probate Code, section 259,[1]
these aliens are not entitled to inherit in California unless the country in which they reside extends reciprocal rights to United States citizens, and that the record contains no evidence to show that the communist government which now controls the Chinese mainland extends any such rights to United States citizens.
In reaching its decision the probate court took judicial notice of a Treaty of Friendship, Commerce and Navigation between the United States of America and the Republic of China, which was signed November 4, 1946, and entered into force November 30, 1948. (63 Stat. 1300.)
Under the provisions of sections 2 and 4 of article VIII of this treaty, each country agrees in substance that the nationals of either party will be permitted to inherit both real and personal property left to them within the other party's territory, regardless of the nationality of the decedent.[2] *Page 163 
Article XXVII of this treaty reads as follows: "Subject to any limitation or exception provided in this Treaty or hereafter agreed upon between the Governments of the High *Page 164 
Contracting Parties, the territories of the High Contracting Parties to which the provisions of this Treaty extend shall be understood to comprise all areas of land and water under the sovereignty or authority of either High Contracting Party, except the Panama Canal Zone."
By its terms this treaty continues in force for a period of five years, and thereafter until terminated on one year's notice by either party. No notice of termination has ever been given.
This treaty, if applicable to the present situation, will prevail over any conflicting provisions of state law. (Kolovrat
v. Oregon, 366 U.S. 187 [81 S.Ct. 922, 6 L.Ed.2d 218].) If the treaty is not applicable, then California may apply its local laws of succession, of which Probate Code, section 259, is a part. (Clark v. Allen, 331 U.S. 503 [67 S.Ct. 1431, 91 L.Ed. 1633, 170 A.L.R. 953].)
[1] In seeking to determine whether subsequent events have deprived the Chinese people of the benefits of the 1946 treaty, it is necessary to look to the acts of the legislative and executive branches of the federal government for an indication of national policy. (Clark v. Allen, supra.)
By taking judicial notice of some of the official acts of the United States Department of State (as authorized by Code of Civil Procedure, section 1875, subdivision 3) this court is aware that the mainland of China is, and for several years has been, under the control of a political organization commonly referred to in the United States as "Communist China" or "Red China," but which calls itself "The People's Republic of China." The United States does not extend diplomatic recognition to the People's Republic, but continues to regard the Republic of China, presently residing on the island of Formosa, as the government of China. (See, for example, 44 Dept. State Bull. 439, 441 (1961) quoting a public statement made by Secretary of State Rusk.) Notwithstanding its refusal to extend recognition to Communist China, our government has, on occasion, dealt with representatives of that regime. In 1955 representatives of the United States and representatives of Communist China conferred *Page 165 
and entered into a written agreement concerning the return of civilians to their respective countries. (U.S. Dept. of State, American Foreign Policy: Current Documents, 1956, at 791 (1959).)
The declarations of the official spokesmen for American foreign policy have made it clear that the policy of non-recognition is not based upon any doubts that the communist regime is in power, but is the result of the acts and attitudes of that regime.[3]
[2] The official public acts of the federal government demonstrate that our government does not regard the 1946 treaty as controlling the relationships between American citizens and the inhabitants of Communist China at the present time. Article II of the 1946 treaty states: "The nationals of either High Contracting Party shall be permitted to enter the territories of the other High Contracting Party, and shall be permitted to reside, travel and carry on trade throughout the whole extent of such territories." Today, contrary to what the treaty would require if it were operative, the United States refuses to issue passports to any of its citizens for travel in the communist-held territory. (Dept. State Bull. 313 (1956) reprinted in U.S. Dept. of State, American Foreign *Page 166 
Policy: Current Documents, 1956, at 805 (1959).) In Worthy v.Herter (D.C. Cir. 1959) 270 F.2d 905, the court held that the refusal of the Secretary of State to issue a passport for travel in Communist China was a proper exercise of the executive power to conduct foreign relations. Judicial relief was denied to an applicant who sought to compel the issuance of such a passport.
The present United States policy against trading with Communist China is just as clear. Foreign Assets Control Regulations of the Department of the Treasury, effective December 17, 1950, issued under the Trading With the Enemy Act (50 U.S.C. App. § 5), have forbidden all persons under the jurisdiction of the United States to engage in transactions with any Chinese national, or even to deal in merchandise originating in China except Formosa, unless specifically authorized by the Secretary of the Treasury. (31 C.F.R. §§ 500.101-500.808.)
In United States v. China Daily News (2d Cir. 1955)224 F.2d 670, the court affirmed the conviction of several persons under the criminal sections of the Trading with the Enemy Act, their crimes being that they had extended credit and received payments from a Chinese bank and had sent checks to persons on the China mainland.
These indications of the national policy toward Communist China and the inhabitants of the mainland provide satisfactory precedent for the decision here. [3] Since the executive branch of the federal government does not recognize the treaty as entitling the inhabitants of Communist China to receive visits from or trade with American citizens, the courts of California are justified in concluding that under present conditions the treaty is not applicable to confer inheritance rights on such persons.
It is immaterial that the Foreign Assets Control Regulations exclude from their prohibition "Any transfer to any person by intestate succession." (31 C.F.R. § 500.525.) This provision, of course, does not confer any rights of succession on any person who is not entitled to succeed under a treaty or under local laws of succession. The Foreign Assets Control Regulations are relevant to this discussion only for the purpose of demonstrating that the federal government conducts its affairs upon the premise that mainland China is not now under the control of the recognized government of the Republic of China and that the persons on the mainland are not entitled to the benefits of the 1946 treaty. *Page 167 
The findings of fact made by the trial court refer to the mother and mother-in-law of the decedent as citizens of the Republic of China. This finding is based upon evidence that those persons are Chinese and reside in Canton. There is no other evidence of their political affiliation. There appears to be no reason to treat these persons any differently from any other person of Chinese nationality who resides in the territory held by the Communists and is subject to the control of that regime.
It thus becomes necessary to consider the effect of California's reciprocity law as set forth in the Probate Code. The burden is upon the public administrator to prove the existence of the reciprocal rights referred to in section 259
(Estate of Bevilacqua, 31 Cal.2d 580, 584 [191 P.2d 752].)
[4] In the probate court the public administrator relied entirely upon the 1946 treaty, but since we know that the recognized government of the Republic of China, which made the treaty, now has nothing to do with the devolution of property in Canton, the treaty is not evidence that reciprocity in fact exists. There being no other evidence on the subject, the order must be reversed.
[5] Appellant's brief suggests that this court take judicial notice of the absence of any right of United States citizens to inherit in Communist China, and direct the probate court to deny the public administrator's petition. The 1957 amendment to Code of Civil Procedure, section 1875, now allows this court to take judicial notice of foreign law. Nevertheless, we have concluded it would be inadvisable to attempt to resolve the issue by judicial notice in an appellate court for two reasons.
The first is that taking judicial notice of foreign law may be quite a different process from taking judicial notice of other matters which can be satisfactorily resolved by examination of readily accessible documents of unquestioned authority. The relevant parts of Code of Civil Procedure, section 1875, are as follows:
"Courts take judicial notice of the following:
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
"4. The law and statutes of foreign countries and of political subdivisions of foreign countries; provided, however, that to enable a party to ask that judicial notice thereof be taken, reasonable notice shall be given to the other parties to the action in the pleadings or otherwise; . . . *Page 168 
"In all these cases the court may resort for its aid to appropriate books or documents of reference. In cases arising under subdivision 4 of this section, the court may also resort to the advice of persons learned in the subject matter, which advice, if not received in open court, shall be in writing and made a part of the record in the action or proceeding."
The practical value of these provisions for giving notice and for consulting learned persons is particularly apparent when one considers the difficulties of investigating the legal system of Communist China. (Cf. Estate of Gogabashvele, 195 Cal.App.2d 503, 529 [16 Cal.Rptr. 77], discussing the legal system of the Soviet Union.) We observe that appellant's brief fails to cite any book or document of reference containing the law which he desires this court to notice. The trial court is the place where the inquiry should first be conducted. (Cf. Estate of Feierman,202 Cal.App.2d 552 [20 Cal.Rptr. 883].)
The second reason is that the existence of reciprocity may involve more than formal law. The issue may turn upon the practical working of the foreign system, as to which oral testimony may be required. (Estate of Schluttig, 36 Cal.2d 416, 423 [224 P.2d 695]; cf. Estate of Arbulich, 41 Cal.2d 86, 91 [257 P.2d 433]; Estate of Gogabashvele, supra, at p. 508.)
There is no conflict between what is decided here and what was said in Estate of Nepogodin, 134 Cal.App.2d 161
[285 P.2d 672]. That case involved a California estate of a decedent who died January 13, 1949, and a group of claimants who resided in Harbin, Manchuria, China, then under the dominion of the communist government of China. Unlike the present case, there was no evidence or contention in Nepogodin that the claimants were nationals of China, only that they were residents. The treaty therefore conferred no rights upon these claimants, and was pertinent only as evidence that China granted inheritance rights to United States citizens, as required by Probate Code, section259 The Nepogodin opinion discusses the conditions which existed in China in 1949. The communists had taken control of much of the territory, including Manchuria. The war was still going on, and the nationalist government had not yet been driven off the continent. The People's Republic was not proclaimed until September 21, 1949. The court observed (p. 170): "It is a wholly unacceptable proposition, not supported by any authority, that with every change in the fortunes of a fluid civil war, the territory of the state and the sphere of applicability *Page 169 
of its treaties should change." Upon that record the trial court's finding that the 1946 treaty was still in effect, and that by reason of the treaty reciprocity existed, was affirmed.
The present case, arising 13 years later, involves no "fluid civil war." The United States denies the legality and morality of the communist regime, but takes cognizance of its existence and power. The relationships of the United States and its citizens with the people of the Chinese mainland are now affected by this reality.
The order is reversed.
Shinn, P.J., and Ford, J., concurred.
Respondent's petition for a hearing by the Supreme Court was denied August 20, 1964.
[1] Probate Code, section 259: "The right of aliens not residing within the United States or its territories to take real property in this State by succession or testamentary disposition, upon the same terms and conditions as residents and citizens of the United States is dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take real property upon the same terms and conditions as residents and citizens of the respective countries of which such aliens are residents and the right of aliens not residing in the United States or its territories to take personal property in this State by succession or testamentary disposition, upon the same terms and conditions as residents and citizens of the United States is dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take personal property upon the same terms and conditions as residents and citizens of the respective countries of which such aliens are residents."
[2] Section 2, article VIII: "If a national, corporation or association of either High Contracting Party, whether or not resident and whether or not engaged in business or other activities within the territories of the other High Contracting Party, is on account of alienage prevented by the applicable laws and regulations within such territories from succeeding as devisee, or as heir in the case of a national, to real or other immovable property situated therein, or to interests in such property, then such national, corporation or association shall be allowed a term of three years in which to sell such property or interest, this term to be reasonably prolonged if circumstances render it necessary. The transmission or receipt of such property shall be exempt from the payment of any estate, succession, probate or administrative taxes or charges other or higher than those now or hereafter imposed in like cases upon the nationals, corporations or associations of the High Contracting Party in whose territory the property is or the interests therein are situated. Moreover, such devisee or heir shall, in conformity with such applicable laws and regulations as are not inconsistent with paragraph 3 of Article XIX, be permitted without interference to withdraw the proceeds of the sale of such property, by obtaining foreign exchange, in the currency of the High Contracting Party of which the devisee is a national, corporation or association, or of which the heir is a national, during a period not in excess of three years after application therefor, upon the most favorable terms applicable to such currency at the time application for the withdrawal of such proceeds is filed, provided such application is made within one year after receipt of the proceeds of sale to which it relates."
Section 4, article VIII: "The nationals of either High Contracting Party shall have full power to dispose of personal property of every kind anywhere within the territories of the other High Contracting Party, by testament, donation or otherwise and their heirs, legatees or donees, being persons of whatever nationality or corporations or associations wherever created or organized, whether resident or nonresident and whether or not engaged in business within the territories of the High Contracting Party where such property is situated, shall succeed to such property, and shall be permitted to take possession thereof, either by themselves or by others acting for them, and to retain or dispose of it at their pleasure, exempt from any restrictions, taxes or charges other or higher than those to which the heirs, legatees or donees of nationals of such other High Contracting Party are or may hereafter be subject in like cases. The nationals, corporations and associations of either High Contracting Party shall be permitted to succeed, as heirs, legatees and donees, to personal property of every kind within the territories of the other High Contracting Party, left or given to them by nationals of such other High Contracting Party or by nationals of any third country, and shall be permitted to take possession thereof, either by themselves or by others acting for them, and to retain or dispose of it at their pleasure, exempt from any restrictions, taxes or charges other or higher than those to which the nationals, corporations and associations of such other High Contracting Party are or may hereafter be subject in like cases. . . ."
The language of section 2 is very similar to the provisions of the German treaty construed in Clark v. Allen, 331 U.S. 503, where the court said (at p. 508 [67 S.Ct. 1431, 91 L.Ed. 1633, 1640, 170 A.L.R. 953, 960]): "The rights secured are in terms a right to sell within a specified time plus a right to withdraw the proceeds and an exemption from discriminatory taxation. It is plain that those rights extend to the German heirs of `any person' holding realty in the United States. And though they are not expressed in terms of ownership or the right to inherit, that is their import and meaning."
[3] See, for example, the statement of Secretary of State Dulles in his report on the Berlin Foreign Ministers Meeting (January 25-February 18, 1954): "My basic position with reference to Communist China was made clear beyond the possibility of misunderstanding.
"In my opening statement (January 26), I said, `I should like to state here, plainly and unequivocally, what the Soviet Foreign Minister already knows — the United States will not agree to join in a five-power conference with the Chinese Communist aggressors for the purpose of dealing generally with the peace of the world. The United States refuses not because, as is suggested, it denies that the regime exists or that it has power. We in the United States well know that it exists and has power because its aggressive armies joined with the North Korean aggressors to kill and wound 150,000 Americans. . . . We do not refuse to deal with it where occasion requires. . . . It is, however, one thing to recognize evil as a fact. It is another thing to take evil to one's breast and call it good.'
"That explains our non-recognition of the Communist regime and also our opposition to its admission to the United Nations." (30 Dept. State Bull. 343, 346 (1954) reprinted in U.S. Dept. of State, American Foreign Policy 1950-1955, at 85, 88 (1957).)
For examples of additional statements, see Address of the American Ambassador to Canada, June 21, 1956; 35 Dept. of State Bull. (1956) reprinted in U.S. Dept. of State, American Foreign Policy: Current Documents, 1956, at 752 (1959); and statement of Secretary of State Rusk, 48 Dept. State Bull. 698, 702 (1963).