Charles Coles **DIGGS** et al., **Appellants,**

v.

George P. **SHULTZ,** Secretary of Treasury, et al.

No. 72–1642.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 13, 1972.

Decided Oct. 31, 1972.

Mr. Morton Stavis, Newark, N. J., with whom Mr. David Rein, Washington, D. C., was on the brief, for appellants.

Mr. Edward S. Christenbury, Atty., Dept. of Justice with whom Mr. Robert L. Keuch, Atty., Dept. of Justice, was on the brief, for appellee Shultz.

Mr. James M. Johnstone, Washington, D. C., with whom Mr. Thomas C. Arthur, Washington, D. C., was on the brief, for appellee Union Carbide Corp.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge and McGOWAN, Circuit Judge.

McGOWAN, Circuit Judge:

This is an appeal from the dismissal by the District Court of a complaint seeking declaratory and injunctive relief in respect of the importation of metallurgical chromite from Southern Rhodesia. The gravamen of this action was an asserted conflict between (1) the official authorization of such importation by the United States, and (2) the treaty obligations of the United States under the United Nations Charter. Plaintiff-appellants sought summary judgment, as did defendant-appellees alternatively to a motion to dismiss for failure to state a claim upon which relief could be given.

The District Court's ruling for appellees was grounded primarily upon lack of standing, but it encompassed as well a concept of the nonjusticiability of the issues raised. Although we believe there was standing upon the part of at least some of the appellants to pursue their cause of action judicially, we think that cause is not one in respect of which

relief can be granted. Accordingly, we affirm the judgment of dismissal.

I

In 1966 the Security Council of the United Nations, with the affirmative vote of the United States, adopted Resolution 232 directing that all member states impose an embargo on trade with Southern Rhodesia—a step which was reaffirmed and enlarged in 1968. In compliance with this resolution, the President of the United States issued Executive Orders 11322 and 11419, 22 U.S.C. § 287c, establishing criminal sanctions for violation of the embargo. In 1971, however, Congress adopted the so-called Byrd Amendment to the Strategic and Critical Materials Stock Piling Act, 50 U.S.C. § 98–98h, which provides in part:

> Sec. 10. Notwithstanding any other provision of law . . . the President may not prohibit or regulate the importation into the United States of any material determined to be strategic and critical pursuant to the provisions of this Act, if such material is the product of any foreign country or area not listed as a Communist-dominated country or area . . . for so long as the importation into the United States of material of that kind which is the product of such Communist-dominated countries or areas is not prohibited by any provision of law.

Since Southern Rhodesia is not a Communist-controlled country, and inasmuch as the United States imports from Communist countries substantial quantities of metallurgical chromite and other materials available from Rhodesia, the Byrd Amendment contemplated the resumption of trade by this country with Southern Rhodesia. By direction of the President, the Office of Foreign Assets Control issued to the corporate appellees in this case a General License authorizing the importation of various materials from Southern Rhodesia, and they began importation.

Alleging that the Byrd Amendment did not and could not authorize issuance

of such a license contrary to this country's treaty obligations, appellants sought to enjoin further importation, to require official seizure, and to restrain use, of materials already imported under the General License, and to declare the General License null and void.

## II

■ The question of standing turns first on whether the party seeking relief has alleged a sufficient personal interest in the controversy to insure concrete adverseness in the presentation of the issues. Association of Data Processing Service v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1969); Baker v. Carr, 369 U.S. 186, 204, 82 S. Ct. 691, 7 L.Ed.2d 663 (1962). Appellants allege various personal injuries, and we agree with the District Court that these allegations amply provide the injury in fact element of the standing requirement.[1]

■■ Another requirement of standing is that the complainant be within the zone of interests sought to be protected by the law in question. Association of Data Processing Service v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L. Ed.2d 184 (1969). United Nations Security Council Resolution 232 was—and is—an attempt by means of concerted international pressure to turn the Rhodesian Government away from the course of action which has resulted in the adverse circumstances experienced by appellants. They are unquestionably within the reach of its purpose and among its intended beneficiaries.

■ Finally, the concept of standing has been characterized as contemplating that there be a "logical nexus between the status asserted and the claim sought to be adjudicated," in order to insure that the litigant is the proper party to represent the interests involved. Flast v. Cohen, 392 U.S. 83, 102, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1967).[2] The District Court found the causal relationship of appellants' claims to the challenged actions too attenuated to constitute such a nexus. That finding rested largely on the conclusion that appellants' quarrel was really with the Rhodesian Government rather than with appellees. But that view fails to focus on the exact nature of the grievance appearing in the complaint.

Appellants, along with many other persons, have suffered, and continue to suffer, tangible injuries at the hands of Southern Rhodesia. In an attempt to terminate the polices giving rise to those wrongs, the United Nations, with the United States as an assenting member, established the embargo. The precise injury of which appellants complain in this law suit is allegedly illegal present action *by the United States* which tends to limit the effectiveness of the embargo and thereby to deprive appellants of its potential benefits. That quarrel is directly and immediately with this government, and not with Southern Rhodesia.

1. We adopt the District Court's identification of those plaintiffs who meet the injury in fact requirement. Appellants M'Gabe and Zimbabive complain they are unable to return to their homeland, Rhodesia. Appellants Diggs, Conyers, Rangel, Stokes and Franck all alleged that they have been refused entry into Rhodesia; and the American Committee on Africa complains that its chairman has also been denied entry. The Council for Christian Social Action of the United Church of Christ alleges its missionaries have been arrested and deported from Rhodesia. Appellant Vidal asserts injury because sale of one of his books is banned in Rhodesia. None of the other plaintiffs have standing; and it is not contended in this court that they have.

2. It is far from clear that this formulation adds anything of substance to the two requirements just discussed. It states a proposition that can well be thought to be related to the merits of a claim rather than to the existence of standing to press it. The District Court, with some support in Supreme Court language, chose to pursue the question as an aspect of standing, although the rationale followed by it is relevant to its dismissal for failure to state a claim warranting relief.

Appellees suggest that the prospects of significant relief by means of the embargo are so slight that this relationship of intended benefit is too tenuous to support standing. But this strikes us as tantamount to saying that because the performance of the United Nations is not always equal to its promise, the commitments of a member may be disregarded without having to respond in court to a charge of treaty violation. It may be that the particular economic sanctions invoked against Southern Rhodesia in this instance will fall short of their goal, and that appellants will ultimately reap no benefit from them. But, to persons situated as are appellants, United Nations action constitutes the only hope; and they are personally aggrieved and injured by the dereliction of any member state which weakens the capacity of the world organization to make its policies meaningful.

Of course it is true that appellants' plight stems initially from acts done by Southern Rhodesia, and that their primary quarrel is with it. But this does not foreclose the existence of a judicially cognizable dispute between appellants, on the one hand, and appellees, on the other, who are said to be acting in derogation of the solemn treaty obligation of the United States to adhere to the embargo for so long as it is in being.[3]

### III

The District Court, in its comments to the effect that non-justiciability would necessitate dismissal of the complaint even if standing be found, reasoned as follows: It is settled constitutional doctrine that Congress may nullify, in whole or in part, a treaty commitment. Congress, by the Byrd Amendment in 1971, acted to abrogate one aspect of our treaty obligations under the U.N. Charter, that is to say, our continued participation in the economic sanctions taken against Southern Rhodesia. The considerations underlying that step by Congress present issues of political policy which courts do not inquire into. Thus, appellants' quarrel is with Congress, and it is a cause which can be pursued only at the polls and not in the courts.

In this court appellants do not seriously contest the first of these propositions, namely, the constitutional power of Congress to set treaty obligations at naught.[4] They seek, rather, to show that, in the Byrd Amendment, Congress did not really intend to compel the Executive to end United States observance of the Security Council's sanctions, and that, therefore, it is the Executive which is, without the essential shield of Congressional dispensation, violating a treaty engagement of this country. Appellants point out in this regard that the Byrd Amendment does not in terms re-

3. The passage of the Byrd Amendment was the subject of widespread notice and comment within the United Nations, resulting in the reaffirmation by the Security Council on February 8, 1972 of the sanctions against Southern Rhodesia. The resolution to this end declared that any legislation passed by any member state "with a view to permitting, directly or indirectly, the importation from Southern Rhodesia of any commodity falling within the scope of the obligations imposed (by the 1968 resolution), including chrome ore, would undermine sanctions and would be contrary to the obligations of States."

4. Moser v. United States, 341 U.S. 41, 45, 71 S.Ct. 553, 95 L.Ed. 729 (1951); Clark v. Allen, 331 U.S. 503, 508–509, 67 S.Ct.

1431, 91 L.Ed. 1633 (1947); Pigeon River Improvement, Slide & Boom Co. v. Cox, 291 U.S. 138, 160, 54 S.Ct. 361, 78 L.Ed. 695 (1934); Edye v. Robertson, 112 U.S. 580, 597, 5 S.Ct. 247, 28 L.Ed. 798 (1884).

Although appellants concede that Congress has the power to override treaty obligations (Appellants' Br. at 23), they contend that our commitment to the U.N. has more force than an ordinary treaty. Appellants argue on the basis of their interpretation of the U.N. Charter that Congress could override Resolution 232 only by withdrawing from the U.N. entirely. There is, however, no evidence that this country's membership in that organization was intended to be on the all-or-nothing basis suggested by appellants.

quire importation from Southern Rhodesia, but leaves open two alternative courses of action. The statute says the President may not ban importation from Rhodesia of materials classified as critical and strategic unless importation from Communist countries is also prohibited. Instead of permitting resumption of trade with Rhodesia, the President, so it is said, could (1) have banned importation of these materials from Communist nations as well as from Rhodesia, or (2) have taken steps to have these materials declassified, thereby taking them in either case out of the scope of the Byrd Amendment.

Citing the canon of construction that a statute should, if possible, be construed in a manner consistent with treaty obligations, appellants argue that the Byrd Amendment, although discretionary on its face, should be construed to compel the President to take one or the other of these two steps as a means of escape from the necessity of breaching the U.N. Charter. But these alternatives raise questions of foreign policy and national defense as sensitive as those involved in the decision to honor or abrogate our treaty obligations.[5] To attempt to decide whether the President chose properly among the three alternatives confronting him "would be, not to decide a judicial controversy, but to as-

sume a position of authority over the governmental acts of another and coequal department, an authority which plainly we do not possess." Frothingham v. Mellon, 262 U.S. 447, 489, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923).

■ We think that there can be no blinking the purpose and effect of the Byrd Amendment. It was to detach this country from the U.N. boycott of Southern Rhodesia in blatant disregard of our treaty undertakings. The legislative record shows that no member of Congress voting on the measure was under any doubt about what was involved then; and no amount of statutory interpretation now can make the Byrd Amendment other than what it was as presented to the Congress, namely, a measure which would make—and was intended to make—the United States a certain treaty violator. The so-called options given to the President are, in reality, not options at all. In any event, they are in neither case alternatives which are appropriately to be forced upon him by a court.[6]

■ Under our constitutional scheme, Congress can denounce treaties if it sees fit to do so, and there is nothing the other branches of government can do about it. We consider that this is precisely what Congress has done in this

5. Russia supplied 60 per cent of our metallurigical chromite in 1970 while the embargo was being observed by the United States, S.Rep.No.92–359, 92d Cong., 1st Sess., 121 (1971), and a decision to discontinue importation would be a serious step in a very delicate area. Similarly, the decision to remove certain materials from the critical and strategic list should be done in a manner consistent with the objectives of that act. 50 U.S.C. § 98. Appellants' view would require reclassification of materials without regard to whether they continue to be critical to national defense. Appellants argue that the apparent surplus in the stockpile indicates the materials are no longer critical. This confuses two distinct functions under the act. One is classification of materials as strategic or critical in order to encourage their development in this country and to avoid dangerous dependency upon other nations. The other is the acquisition of certain quantities of these materials to be stockpiled for use in an emergency. A surplus in the stock pile at a given moment does not mean that it is no longer necessary to be concerned about the dependency of this country on outside sources for the materials in question.

6. The Supreme Court in Baker v. Carr was at pains to point out that the so-called "political question doctrine" is an aspect of the separation of powers prescribed by the Federal Constitution; and that, in the intra-federal context, it continues to have meaningful vitality to restrain interference by one branch of the federal establishment with concerns committed to another. The case before us is a classic one for the careful appraisal by a court of the consequences of an exercise of jurisdiction it may technically be thought to have.

467

case; and therefore the District Court was correct to the extent that it found the complaint to state no tenable claim in law.

Affirmed.

WILBUR K. MILLER, Senior Circuit Judge, concurs in the result.